# MEMBERSHIP INTEREST PURCHASE AGREEMENT

between

## DAN PETERSON, as Trustee of the Dan D. Peterson
## Living Trust dated April 2, 2009

and

## ONPOINT ACQUISITIONS, LLC

dated effective as of

October 31, 2019

PETERSON_000069

## TABLE OF CONTENTS

**ARTICLE I** DEFINITIONS........................................................................................................ 1

**ARTICLE II** PURCHASE AND SALE ...................................................................................... 6

Section 2.01 Purchase and Sale.................................................................................................... 6

Section 2.02 Opening of Escrow.................................................................................................. 6

Section 2.03 Purchase Price. ........................................................................................................ 6

Section 2.04 Transactions to be Effected at the Closing. ............................................................ 6

Section 2.05 Purchase Price Adjustment..................................................................................... 7

Section 2.06 Closing..................................................................................................................... 7

Section 2.07 Withholding Tax...................................................................................................... 7

Section 2.08 Exclusions from Sale.............................................................................................. 8

**ARTICLE III** REPRESENTATIONS AND WARRANTIES OF SELLER..................... 8

Section 3.01 Organization and Authority of Seller. .................................................................... 8

Section 3.02 Organization, Authority and Qualification of the Company.................................... 8

Section 3.03 Capitalization........................................................................................................... 9

Section 3.04 No Subsidiaries........................................................................................................ 9

Section 3.05 No Conflicts; Consents............................................................................................ 9

Section 3.06 Financial Statements................................................................................................ 10

Section 3.07 Undisclosed Liabilities. .......................................................................................... 10

Section 3.08 Absence of Certain Changes, Events and Conditions............................................. 11

Section 3.09 Material Contracts. .................................................................................................. 13

Section 3.10 Title to Assets; Real Property.................................................................................. 14

Section 3.11 Condition And Sufficiency of Assets. .................................................................... 15

Section 3.12 Intellectual Property. ............................................................................................... 15

Section 3.13 Inventory. ................................................................................................................ 16

Section 3.14 Accounts Receivable. .............................................................................................. 16

Section 3.15 Customers and Suppliers. ....................................................................................... 17

Section 3.16 Insurance. ................................................................................................................ 17

Section 3.17 Legal Proceedings; Governmental Orders. ............................................................. 17

Section 3.18 Compliance With Laws; Permits. ........................................................................... 18

i

Section 3.19 Environmental Matters. ............................................................................................. 18

Section 3.20 Employee Benefit Matters. ....................................................................................... 18

Section 3.21 Employment Matters. ............................................................................................... 20

Section 3.22 Taxes. ........................................................................................................................ 21

Section 3.23 Books and Records. ................................................................................................... 22

Section 3.24 Brokers. ..................................................................................................................... 23

Section 3.25 Related-Party Transactions. ...................................................................................... 23

Section 3.26 Full Disclosure........................................................................................................... 23

**ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF BUYER ................... 23

Section 4.01 Organization and Authority of Buyer. ...................................................................... 23

Section 4.02 No Conflicts; Consents. ............................................................................................ 23

Section 4.03 Investment Purpose. .................................................................................................. 24

Section 4.03 Investment Purpose. .................................................................................................. 24

Section 4.04 Brokers. ..................................................................................................................... 24

Section 4.05 Legal Proceedings. .................................................................................................... 24

**ARTICLE V** COVENANTS ........................................................................................... 25

Section 5.01 Resignations. ............................................................................................................. 25

Section 5.02 Confidentiality. .......................................................................................................... 25

Section 5.03 Non-competition; Non-solicitation ........................................................................... 25

Section 5.04 Books and Records. ................................................................................................... 26

Section 5.05 Public Announcements. ............................................................................................. 27

Section 5.06 Further Assurances. ................................................................................................... 27

**ARTICLE VI** TAX MATTERS ...................................................................................... 27

Section 6.01 Pro Rations. ............................................................................................................... 27

Section 6.02 Outside of Closing. .................................................................................................... 28

Section 6.03 Tax Covenants. .......................................................................................................... 28

Section 6.04 Straddle Period. ......................................................................................................... 29

Section 6.05 Cooperation and Exchange of Information. .............................................................. 29

**ARTICLE VII** CONDITIONS TO CLOSING ............................................................... 29

Section 7.01 Conditions to Obligations of All Parties................................................................... 29

ii

Section 7.02 Conditions to Obligations of Buyer. ........................................................ 30

Section 7.03 Conditions to Obligations of Seller. ....................................................... 31

**ARTICLE VIII** INDEMNIFICATION ............................................................ 31

Section 8.01 Survival. ................................................................................................ 31

Section 8.02 Indemnification By Seller. .................................................................... 32

Section 8.02 Indemnification By Seller. .................................................................... 32

Section 8.03 Certain Limitations. .............................................................................. 32

Section 8.04 Indemnification Procedures. ................................................................. 33

Section 8.05 Payments. .............................................................................................. 35

Section 8.06 Tax Treatment of Indemnification Payments. ....................................... 35

Section 8.07 Exclusive Remedies. ............................................................................. 35

**ARTICLE IX** MISCELLANEOUS ............................................................... 36

Section 9.01 Expenses. .............................................................................................. 36

Section 9.02 Notices. ................................................................................................. 36

Section 9.03 Interpretation. ....................................................................................... 37

Section 9.04 Headings. .............................................................................................. 37

Section 9.05 Severability. .......................................................................................... 37

Section 9.06 Entire Agreement. ................................................................................. 38

Section 9.07 Successors and Assigns. ....................................................................... 38

Section 9.08 No Third-party Beneficiaries. .............................................................. 38

Section 9.09 Amendment and Modification; Waiver. ............................................... 38

Section 9.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. ..... 38

Section 9.11 Counterparts. ......................................................................................... 39

PLEDGE AND SECURITY AGREEMENT ................................................. 48

ASSIGNMENT OF LLC INTERESTS ......................................................... 54

iii

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated effective as of October 31, 2019 ("**Execution Date**"), is entered into between Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009, a revocable trust formed under the laws of the State of Arizona ("**Seller**"), and OnPoint Acquisitions, LLC, a Delaware limited liability company ("**Buyer**").

### RECITALS

WHEREAS, Seller owns all of the issued and outstanding membership interests (the "**Membership Interests**"), of Dan Peterson Property Management, LLC, an Arizona limited liability company (the "**Company**"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Membership Interests, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

#### DEFINITIONS

The following terms have the meanings specified or referred to in this **Article I**:

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Akron, Ohio are authorized or required by Law to be closed for business.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company Intellectual Property**" means all Intellectual Property that is owned or held for use by the Company.

"**Company IP Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to Intellectual Property to which the Company is a party, beneficiary or otherwise bound.

"**Company IP Registrations**" means all Company Intellectual Property that is subject to any issuance registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Consulting Agreement**" means the consulting agreement in the form of **Exhibit A** hereto pursuant to which Dan Peterson shall provide mutually-agreed upon consulting and transition services to the Company and Buyer, as more fully detailed therein.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or \$**" means the lawful currency of the United States.

"**Encumbrance**" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic

2

Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"**Intellectual Property**" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any authorized private registrar or Governmental Authority, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and

3

other social media companies and the content found thereon and related thereto, and URLs; (c) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration and renewals of such copyrights; (d) inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections and other confidential and proprietary information and all rights therein; (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); and (f) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation.

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of Seller or the Company, after due inquiry.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Losses**" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however,* that "**Losses**" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Authority or other third party.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Company, or (b) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; *provided, however,* that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Company operates; (iii) any changes in financial or securities markets in general; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement, except pursuant to **Section 3.05**; (vi) any changes in applicable Laws or accounting rules; or (vii) the public announcement, pendency or completion of the transactions contemplated by this Agreement; *provided further, however,* that any event, occurrence, fact, condition or change referred to in clauses (i)

through (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition or change has a disproportionate effect on the Company compared to other participants in the industries in which the Company conducts its businesses.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Pledge and Security Agreement**" means the pledge agreement in the form of **Exhibit B** hereto covering all of the Membership Interests in Dan Peterson Property Management, LLC acquired by Buyer hereunder as security for the Promissory Note.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"**Pre-Closing Taxes**" means Taxes of the Company for any Pre-Closing Tax Period.

"**Promissory Note**" means a promissory note from Buyer in favor of Seller, in the form of **Exhibit C** hereto, in the total amount of $800,000 (the "**Promissory Note Value**"), payable in a lump sum thirty-six (36) months after the Closing Date and secured by the Pledge and Security Agreement.

"**Real Property**" means the real property owned, leased or subleased by the Company, together with all buildings, structures and facilities located thereon.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Business**" means community property management.

"**Seller**" has the meaning set forth in the preamble.

5

PETERSON_000077

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Territory**" means the State of Arizona.

"**Transaction Documents**" means this Agreement, the Promissory Note, the Pledge and Security Agreement, the Consulting Agreement, and the other agreements, instruments and documents required to be delivered at the Closing.

## ARTICLE II

### PURCHASE AND SALE

**Section 2.01     Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Membership Interests, free and clear of all Encumbrances, for the consideration specified in **Section 2.03**.

**Section 2.02     Opening of Escrow.** Within five (5) business days of the Execution Date, Buyer and Seller shall mutually agree upon an escrow agent ("**Escrow Agent**") and an escrow (the "**Escrow**") shall be deemed open with Escrow Agent, which Escrow shall be governed by the terms of this Agreement.

**Section 2.03     Purchase Price.** The aggregate purchase price for the Membership Interests shall be $1,800,000, subject to adjustment pursuant to **Sections 2.04** and **2.05** hereof (the "**Purchase Price**").

**Section 2.04     Transactions to be Effected at the Closing.**

(a)     At the Closing, Buyer shall deliver to Seller:

(i)     the Purchase Price, subject to any Closing adjustment pursuant to **Section 2.05**, *less* the Holdback Amount, *less* the Promissory Note Value, by wire transfer of immediately available; and

(ii)     duly executed originals of the Transaction Documents and all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to **Section 7.03** of this Agreement.

(b)      Within two (2) business days of the opening of the Escrow with the Escrow Agent, Buyer shall deposit $250,000.00 of the Purchase Price (the **"Holdback Amount"**) with the Escrow Agent for a period of eighteen (18) months following the Closing Date (the "**Holdback Period**"). The Escrow Agent shall place the Holdback Amount in an interest-bearing account selected by Seller with all interest accruing thereon credited to Seller; provided, however, the interest accruing thereon shall not be applied to reduce the Purchase Price.   The Holdback Amount will be available to compensate Buyer for indemnification obligations under **Section 8.02** of this Agreement and to fund payments to Buyer required by **Section 2.05** of this Agreement.   Upon expiration of the Holdback Period, unless Buyer has previously made a claim, Escrow Agent shall pay the balance of the Holdback Amount and interest, if any, to Seller.

(c)      At the Closing, Seller shall deliver to Buyer:

(i)      a duly executed membership interest transfer power, in the form of **Exhibit D** hereto ("**Transfer Power**"), evidencing the transfer of the Membership Interests, free and clear of all Encumbrances; and

(ii)     duly executed originals of the Transaction Documents and all other agreements, documents, instruments or certificates required to be delivered by Seller at or prior to the Closing pursuant to **Section 7.02** of this Agreement.

**Section 2.05      Capital and Possible Purchase Price Adjustment.** Seller and Buyer agree that as of the Closing, the Company's cash accounts shall hold not less than Twenty Thousand and 00/100 Dollars ($20,000.00) in capital (the **"Agreed Working Capital"**). In the event that such Company accounts hold more than the Agreed Working Capital as of the Closing Date, Buyer shall pay the amount in excess of the Agreed Working Capital to Seller. In the event that such Company accounts hold less than the Agreed Working Capital as of the Closing Date, the Purchase Price shall be reduced by the amount of the deficiency in the Agreed Working Capital in the form of a reduction in the amount of the Promissory Note.

**Section 2.06      Closing.** Subject to the terms and conditions of this Agreement, the purchase and sale of the Membership Interests contemplated hereby (the "**Closing**") shall be effective as of October 31, 2019 at 11:59 p.m. (the "**Closing Date**").

**Section 2.07      Withholding Tax.** Buyer and the Company shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer and the Company may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 2.08      Exclusions from Sale.** Notwithstanding the foregoing, (a) Seller shall retain (i) all accounts receivable from vendor affiliation agreements where such receivables have been earned and billed to the vendor on or before the Closing, and (ii) disclosure income that has been earned and billed on or before the Closing. After the Closing Date, if Buyer or the Company receive any payments relating to subsections (i) or (ii) above, Buyer shall promptly make delivery thereof to Seller; provided, however, that (b) Seller shall pay all accounts payable in full on or before the Closing and any payables incurred but not yet billed as of the Closing shall be the responsibility of the Seller.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this **Article III** are true and correct as of the date hereof.

**Section 3.01      Authority of Seller.** Seller is a revocable living trust, validly existing under the laws of the State of Arizona. Seller has full power and authority to enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms. When each other Transaction Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms.

**Section 3.02      Incorporation, Authority and Qualification of the Company.** The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Arizona and has full limited liability company power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted. All limited liability company actions taken by the Company in connection with this Agreement and the other Transaction Documents will be duly authorized on or prior to the Closing. **Section 3.02** of the Disclosure Schedules sets forth each jurisdiction in which the Company is licensed or qualified to do business, and the Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business

as currently conducted makes such licensing or qualification necessary. All limited liability company actions taken by the Company in connection with this Agreement and the other Transaction Documents will be duly authorized on or prior to the Closing.

**Section 3.03    Capitalization.**

(a)    Seller owns one hundred percent (100%) of the Membership Interests issued and outstanding, constituting all of the Membership Interests of the Company. All of the Membership Interests have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances. Upon consummation of the transactions contemplated by this Agreement, Buyer shall own all of the Membership Interests, free and clear of all Encumbrances.

(b)    All of the Membership Interests were issued in compliance with applicable Laws. None of the Membership Interests were issued in violation of any agreement, arrangement or commitment to which Seller or the Company is a party or is subject to or in violation of any preemptive or similar rights of any Person.

(c)    There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital Membership Interests of the Company or obligating Seller or the Company to issue or sell any Membership Interests of capital Membership Interests of, or any other interest in, the Company. The Company does not have outstanding or authorized any Membership Interests appreciation, phantom Membership Interests, profit participation or similar rights. There are no voting trusts, Membership Interests holder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

**Section 3.04    No Subsidiaries.** The Company does not own, or have any interest in any Membership Interests or have an ownership interest in any other Person.

**Section 3.05    No Conflicts; Consents.** The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the articles of organization, operating agreement or other organizational documents of Seller or the Company; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller or the Company; (c) except as set forth in **Section 3.05** of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which Seller or the

9

Company is a party or by which Seller or the Company is bound or to which any of their respective properties and assets are subject (including any Material Contract) or any Permit affecting the properties, assets or business of the Company; or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any properties or assets of the Company except as set forth in **Section 3.05** of the Disclosure Schedules. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller or the Company in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 3.06    Financial Statements.** Complete copies of the Company's unaudited financial statements consisting of the balance sheet of the Company as at December 31 in each of the years 2016, 2017 and 2018 and the related statements of income and retained earnings (including profits and loss statements), Membership Interest holders' equity and cash flow for the years then ended (the "**Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Company as at September 30, 2019 and the related statements of income and retained earnings, Membership Interest holders' equity and cash flow for the nine (9)-month period then ended (the "**Interim Financial Statements**" and together with the Financial Statements, the "**Financial Statements**") are included in **Section 3.06** of the Disclosure Schedules. The Financial Statements have been prepared in accordance with the Company's historically applied accounting methods, practices, principles, policies and procedures, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Financial Statements). The Financial Statements are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The balance sheet of the Company as of December 31, 2018 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of the Company as of September 30, 2019 is referred to herein as the "**Interim Balance Sheet**" and the date thereof as the "**Interim Balance Sheet Date**". The Balance Sheet and the Interim Balance Sheet are included in **Section 3.06** of the Disclosure Schedules.  Buyer acknowledges that the Company's system of accounting has not been established or administered in accordance with generally accepted accounting principles ("GAAP").

**Section 3.07    Undisclosed Liabilities.** The Company has no liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise ("**Liabilities**"), except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, (b)

those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount, or (c) those which are part of obligations of the Material Contracts as set forth in **Section 3.09**.

**Section 3.08**     **Absence of Certain Changes, Events and Conditions.** Since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to the Company, any:

(a)     event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     amendment of the organizational documents of the Company;

(c)     split, combination or reclassification of any Membership Interests of its capital Membership Interests;

(d)     issuance, sale or other disposition of any of its capital Membership Interests, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its capital Membership Interests;

(e)     declaration or payment of any dividends or distributions on or in respect of any of its capital Membership Interests or redemption, purchase or acquisition of its capital Membership Interests, excluding any distribution of any working capital in excess of the Agreed Working Capital amount;

(f)     material change in any method of accounting or accounting practice of the Company, except as disclosed in the Financial Statements;

(g)     material change in the Company's cash management practices and its policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(h)     entry into any Contract that would constitute a Material Contract;

(i)     incurrence, assumption or guarantee of any indebtedness for borrowed money except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

(j)     transfer, assignment, sale or other disposition of any of the assets shown or reflected in the Balance Sheet or cancellation of any debts or entitlements;

(k)     transfer, assignment or grant of any license or sublicense of any material rights under or with respect to any Company Intellectual Property or Company IP Agreements;

(l)     material damage, destruction or loss (whether or not covered by insurance) to its property;

11

(m)    any capital investment in, or any loan to, any other Person;

(n)    acceleration, termination, material modification to or cancellation of any material Contract (including, but not limited to, any Material Contract) to which the Company is a party or by which it is bound;

(o)    any material capital expenditures;

(p)    imposition of any Encumbrance upon any of the Company properties, capital Membership Interests or assets, tangible or intangible;

(q)    (i) grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of its current or former employees, officers, directors, independent contractors or consultants, other than as provided for in any written agreements or required by applicable Law, (ii) change in the terms of employment for any employee or any termination of any employees for which the aggregate costs and expenses exceed $5,000, or (iii) action to accelerate the vesting or payment of any compensation or benefit for any current or former employee, officer, director, independent contractor or consultant;

(r)    hiring or promoting any person as or to (as the case may be) an officer or hiring or promoting any employee below officer except to fill a vacancy in the ordinary course of business;

(s)    adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, independent contractor or consultant, (ii) Benefit Plan or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

(t)    any loan to (or forgiveness of any loan to), or entry into any other transaction with, any of its Membership Interest holders or current or former directors, officers and employees;

(u)    entry into a new line of business or abandonment or discontinuance of existing lines of business;

(v)    adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(w)    purchase, lease or other acquisition of the right to own, use or lease any property or assets for an amount in excess of $1,000, individually (in the case of a lease, per annum) or $1,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of inventory or supplies in the ordinary course of business consistent with past practice;

(x)    acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets or Membership Interests of, or by any other manner, any business or any Person or any division thereof;

12

(y)     action by the Company to make, change or rescind any Tax election, amend any Tax Return or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer in respect of any Post-Closing Tax Period; or

(z)     any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

      **Section 3.09     Material Contracts.**

(a)     **Section 3.09(a)** of the Disclosure Schedules lists each of the following Contracts of the Company (such Contracts, together with all Contracts concerning the occupancy, management or operation of any Real Property (including without limitation, brokerage contracts) listed or otherwise disclosed in **Section 3.10(b)** of the Disclosure Schedules and all Company IP Agreements set forth in **Section 3.12(b)** of the Disclosure Schedules, being "**Material Contracts**"):

(i)     each Contract of the Company involving aggregate consideration in excess of $1,000 and which, in each case, cannot be cancelled by the Company without penalty or without more than 30 days' notice;

(ii)     all Contracts that require the Company to purchase its total requirements of any product or service from a third party or that contain "take or pay" provisions;

(iii)     all Contracts that provide for the indemnification by the Company of any Person or the assumption of any Tax, environmental or other Liability of any Person;

(iv)     all Contracts that relate to the acquisition or disposition of any business, a material amount of Membership Interests or assets of any other Person or any real property (whether by merger, sale of Membership Interests, sale of assets or otherwise);

(v)     all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which the Company is a party;

(vi)     all employment agreements and Contracts with independent contractors or consultants (or similar arrangements) to which the Company is a party and which are not cancellable without material penalty or without more than 30 days' notice;

(vii)     except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees) of the Company;

(viii)     all Contracts with any Governmental Authority to which the Company is a party;

(ix)     all Contracts that limit or purport to limit the ability of the Company to compete in any line of business or with any Person or in any geographic area or during any period of time;

PETERSON_000085

(x)     any Contracts to which the Company is a party that provide for any joint venture, partnership or similar arrangement by the Company;

(xi)     all Contracts between or among the Company on the one hand and Seller on the other hand;

(xii)     all collective bargaining agreements or Contracts with any Union to which the Company is a party; and

(xiii)     any other Contract that is material to the Company and not previously disclosed pursuant to this **Section 3.09**.

(b)     Each Material Contract is valid and binding on the Company in accordance with its terms and is in full force and effect. None of the Company or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Material Contract. No event or circumstance has occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer.

**Section 3.10     Title to Assets; Real Property.**

(a)     The Company has good and valid title to, or a valid leasehold interest in, all Real Property and personal property and other assets reflected in the Financial Statements or acquired after the Balance Sheet Date, other than properties and assets sold or otherwise disposed of in the ordinary course of business consistent with past practice since the Balance Sheet Date. All such properties and assets (including leasehold interests) are free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"): those items set forth in **Section 3.10(a)** of the Disclosure Schedules.

(b)     **Section 3.10(b)** of the Disclosure Schedules lists (i) the street address of each parcel of Real Property; (ii) if such property is leased or subleased by the Company, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease for each leased or subleased property; and (iii) the current use of such property. With respect to leased Real Property, Seller has delivered or made available to Buyer true, complete and correct copies of any leases affecting the Real Property. All such leases are (x) in full force and effect and constitute valid and binding obligations of the Company and the other party thereto, and (y) the Company is not in default in any material respect under any of the leases. The Company is not a sublessor or grantor under any sublease or other instrument granting to any other Person any right to the possession, lease, occupancy or

enjoyment of any leased Real Property. The use and operation of the Real Property in the conduct of the Company's business do not violate in any material respect any Law, covenant, condition, restriction, easement, license, permit or agreement. There are no Actions pending nor, to the Seller's Knowledge, threatened against or affecting the Real Property or any portion thereof or interest therein in the nature or in lieu of condemnation or eminent domain proceedings.

**Section 3.11    Condition and Sufficiency of Assets.** The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of the Company are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property currently owned or leased by the Company, together with all other properties and assets of the Company, are sufficient for the continued conduct of the Company's business after the Closing in substantially the same manner as conducted prior to the Closing and to Seller's Knowledge constitute all of the rights, property and assets necessary to conduct the business of the Company as currently conducted.

**Section 3.12    Intellectual Property.**

(a)    **Section 3.12(a)** of the Disclosure Schedules lists all (i) Company IP Registrations and (ii) Company Intellectual Property, including software, that are not registered but that are material to the Company's business or operations. All required filings and fees related to the Company IP Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Company IP Registrations are otherwise in good standing.

(b)    **Section 3.12(b)** of the Disclosure Schedules lists all Company IP Agreements. Seller has provided Buyer with true and complete copies of all such Company IP Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Company IP Agreement is valid and binding on the Company in accordance with its terms and is in full force and effect. Neither the Company nor any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of breach or default of or any intention to terminate, any Company IP Agreement.

(c)    The Company is the sole and exclusive legal and beneficial, and with respect to the Company IP Registrations, record, owner of all right, title and interest in and to the Company Intellectual Property, and has the valid right to use all other Intellectual Property used in or necessary for the conduct of the Company's current business or operations, in each case, free and clear of Encumbrances other than

15

Permitted Encumbrances. Without limiting the generality of the foregoing, Seller has entered into binding, written agreements with every current and former employee of the Company, and with every current and former independent contractor, whereby such employees and independent contractors (i) assign to the Company any ownership interest and right they may have in the Company Intellectual Property; and (ii) acknowledge the Company's exclusive ownership of all Company Intellectual Property. Seller has provided Buyer with true and complete copies of all such agreements.

(d)      The Company's rights in the Company Intellectual Property are valid, subsisting and enforceable. The Company has taken all reasonable steps to maintain the Company Intellectual Property and to protect and preserve the confidentiality of all trade secrets included in the Company Intellectual Property, including requiring all Persons having access thereto to execute written non-disclosure agreements.

(e)      There are no Actions (including any oppositions, interferences or re-examinations) settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by the Company; (ii) challenging the validity, enforceability, registrability or ownership of any Company Intellectual Property or the Company's rights with respect to any Company Intellectual Property; or (iii) by the Company or any other Person alleging any infringement, misappropriation, dilution or violation by any Person of the Company Intellectual Property. The Company is not subject to any outstanding or prospective Governmental Order (including any motion or petition therefor) that does or would restrict or impair the use of any Company Intellectual Property.

**Section 3.13      Inventory.** All inventory of the Company, whether or not reflected in the Balance Sheet, consists of a quality and quantity usable and salable in the ordinary course of business consistent with past practice, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established. All such inventory is owned by the Company free and clear of all Encumbrances, and no inventory is held on a consignment basis.

**Section 3.14      Accounts Receivable.** The accounts receivable reflected on the Interim Balance Sheet and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by the Company involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; and (b) constitute valid claims of the Company not subject to claims of set-off or other defenses or counterclaims and are collectable within 90 days after billing. Any reserve for bad debts shown on the Interim Balance Sheet or, with respect to accounts receivable arising after the Interim Balance Sheet Date, on the accounting records of the Company have

PETERSON_000088

not been determined in accordance with GAAP but have determined using the Company's historically applied accounting methods, practices, principles, policies and procedures.

**Section 3.15    Customers and Suppliers.**

(a)    **Section 3.15(a)** of the Disclosure Schedules sets forth (i) each customer/client who has paid aggregate consideration to the Company for goods or services rendered in an amount greater than or equal to $3,000 for each of the two (2) most recent fiscal years (collectively, the "**Material Customers**"); and (ii) the amount of consideration paid by each Material Customer during such periods. The Company has not received any notice, and has no reason to believe, that any of its current Material Customers intend to cease, after the Closing, to use its goods or services or to otherwise terminate or materially reduce its relationship with the Company. The Company has properly managed all money of its Material Customers that it holds in trust or to which it has access to operate the Business and no shortfall exists in any of the accounts of the Material Customers.

(b)    **Section 3.15(b)** of the Disclosure Schedules sets forth (i) each supplier to whom the Company has paid consideration for goods or services rendered in an amount greater than or equal to $1,000 for each of the two (2) most recent fiscal years (collectively, the "**Material Suppliers**"); and (ii) the amount of purchases from each Material Supplier during such periods. The Company has not received any notice, and has no reason to believe, that any of its Material Suppliers has ceased, or intends to cease, to supply goods or services to the Company or to otherwise terminate or materially reduce its relationship with the Company.

**Section 3.16    Insurance. Section 3.16** of the Disclosure Schedules sets forth a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, directors' and officers' liability, fiduciary liability and other casualty and property insurance maintained by Seller and relating to the assets, business, operations, employees, officers and directors of the Company (collectively, the "**Insurance Policies**") and true and complete copies of such Insurance Policies have been made available to Buyer. Such Insurance Policies are in full force and effect as of the Closing Date. Seller has not received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have either been paid or, if due and payable prior to Closing, will be paid prior to Closing in accordance with the payment terms of each Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Company.

**Section 3.17    Legal Proceedings; Governmental Orders.**

(a)    Except as set forth in **Section 3.17(a)** of the Disclosure Schedules, there are no Actions pending or, to Seller's Knowledge, threatened (a) against or by the Company affecting any of its

17

PETERSON_000089

properties or assets (or by or against Seller relating to the Company); or (b) against or by the Company, Seller that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)       There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Company or any of its properties or assets.

**Section 3.18    Compliance with Laws; Permits.**

(a)       To Seller's Knowledge, the Company has complied, and is now complying, with all Laws applicable to it or its business, properties or assets.

(b)       All Permits required for the Company to conduct its business have been obtained by it and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. **Section 3.18(b)** of the Disclosure Schedules lists all current Permits issued to the Company, including the names of the Permits and their respective dates of issuance and expiration. To Seller's Knowledge, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in **Section 3.18(b)** of the Disclosure Schedules.

**Section 3.19    Environmental Matters.** The Company is currently and at all relevant times has been in compliance with all Environmental Laws and has not, and the Seller has not, received from any Person any: (a) Environmental Notice or Environmental Claim; or (b) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

**Section 3.20    Employee Benefit Matters.**

(a)       **Section 3.20(a)** of the Disclosure Schedules contains a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, Membership Interests or Membership Interests based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by the Company for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Company or any spouse or dependent of such individual or under which the Company has or may have any liability (as listed on  of the Disclosure Schedules, each, a "**Benefit Plan**").

18

(b)     With respect to each Benefit Plan, Seller has made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, employee handbooks and any other written communications (or a description of any oral communications) relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service; (vi) in the case of any Benefit Plan for which a Form 5500 is required to be filed, a copy of the two most recently filed Form 5500, with schedules and financial statements attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the two most recently completed plan years; (viii) the most recent nondiscrimination tests performed under the Code; and (ix) copies of material notices, letters or other correspondence from the Internal Revenue Service, Department of Labor, Pension Benefit Guaranty Corporation or other Governmental Authority relating to the Benefit Plan.

(c)     Each Benefit Plan and related trust has been established, administered and maintained in accordance with its terms and in compliance with all applicable Laws (including ERISA and the Code and any applicable local Laws). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "**Qualified Benefit Plan**") is so qualified and has received a favorable and current determination letter from the Internal Revenue Service, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and nothing has occurred that could reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. Nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject the Company, with respect to any period on or after the Closing Date, Buyer, to a penalty under Section 502 of ERISA or to tax or penalty under Section 4975 of the Code. All benefits, contributions and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles, and all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved.

(d)     There is no pending or, to Seller's Knowledge, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the three (3) years prior to the

19

date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority.

(e) There has been no amendment to, announcement by Seller, or the Company relating to, or change in employee participation or coverage under, any Benefit Plan or collective bargaining agreement that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year with respect to any director, officer, employee, independent contractor or consultant, as applicable. Neither Seller nor the Company has any commitment or obligation or has made any representations to any director, officer, employee, independent contractor or consultant, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan or any collective bargaining agreement.

(f) Each individual who is classified by the Company as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Benefit Plan.

(g) Neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor or consultant of the Company to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation due to any such individual; (iii) limit or restrict the right of the Company to merge, amend or terminate any Benefit Plan; (iv) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; (v) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (vi) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

**Section 3.21    Employment Matters.**

(a) **Section 3.21(a)** of the Disclosure Schedules contains a list of all persons who are employees, independent contractors or consultants of the Company as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; and (vi) a description of the fringe benefits provided to each such individual as of the date hereof. Except as set forth in **Section 3.21(a)** of the Disclosure Schedules, as of the date hereof, all compensation, including wages, commissions and bonuses, payable to all employees, independent contractors or consultants of the Company for services performed on or prior to the date hereof have been paid in full and there are no outstanding agreements, understandings or commitments of the Company with respect to any compensation, commissions or bonuses to be paid after Closing.

(b)     The Company is not, and has not been a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has not been any Union representing or purporting to represent any employee of the Company.

(c)     The Company is and has been in compliance with all applicable Laws pertaining to employment and employment practices, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance. All individuals characterized and treated by the Company as independent contractors or consultants are properly treated as independent contractors under all applicable Laws. All employees of the Company classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified. There are no Actions against the Company pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant or independent contractor of the Company, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wage and hours or any other employment related matter arising under applicable Laws.

**Section 3.22     Taxes.** Except as set forth in **Section 3.22** of the Disclosure Schedules:

(a)     All Tax Returns required to be filed on or before the Closing Date by the Company have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by the Company (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)     The Company has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, member or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)     No claim has been made by any taxing authority in any jurisdiction where the Company does not file Tax Returns that it is, or may be, subject to Tax by that jurisdiction.

(d)     No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Company.

(e)     The amount of the Company's Liability for unpaid Taxes for all periods ending on or before September 30, 2019 does not, in the aggregate, exceed the amount of accruals for Taxes (excluding

reserves for deferred Taxes) reflected on the Financial Statements. The amount of the Company's Liability for unpaid Taxes for all periods following the end of the recent period covered by the Financial Statements shall not, in the aggregate, exceed the amount of accruals for Taxes (excluding reserves for deferred Taxes) as adjusted for the passage of time in accordance with the past custom and practice of the Company (and which accruals shall not exceed comparable amounts incurred in similar periods in prior years).

(f)     **Section 3.22(f)** of the Disclosure Schedules sets forth:

(i)     the taxable years of the Company as to which the applicable statutes of limitations on the assessment and collection of Taxes have not expired;

(ii)    those years for which examinations by the taxing authorities have been completed; and

(iii)   those taxable years for which examinations by taxing authorities are presently being conducted.

(g)     The Company is not a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority.

(h)     Seller has delivered to Buyer copies of all federal, state, local and foreign income, franchise and similar Tax Returns, examination reports, and statements of deficiencies assessed against, or agreed to by, the Company for all Tax periods ending after December 31, 2016.

(i)     There are no Encumbrances for Taxes (other than for current Taxes not yet due and payable) upon the assets of the Company.

(j)     The Company is not a party to, or bound by, any Tax indemnity, Tax sharing or Tax allocation agreement.

(k)     No private letter rulings, technical advice memoranda or similar agreement or rulings have been requested, entered into or issued by any taxing authority with respect to the Company.

(l)     Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2. The Company is not, nor has it been, a United States real property holding corporation (as defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(a) of the Code.

**Section 3.23    Books and Records**. The books of account, Company record books, and other records of the Company, all of which have been made available to Buyer, are complete and correct and have been maintained in accordance with sound business practices. At the Closing, all of those books and records will be in the possession of the Company.

**Section 3.24     Brokers.** Except for Joe Balbona, Business Brokerage Realtor, Consulting & Advisory Services, REMAX Commercial, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller. Seller shall be responsible for the payment of all fees related to such broker.

**Section 3.25     Related-Party Transactions.** Seller has not been involved in any material business arrangement or relationship with the Company within the past twelve (12) months, and the Seller does not own any asset, tangible or intangible, which is used in the business of the Company except for any excluded asset set forth on **Schedule 3.24** hereto.

**Section 3.26     Full Disclosure.** No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this **Article IV** are true and correct as of the date hereof.

**Section 4.01     Organization and Authority of Buyer.** Buyer is a limited liability company duly organized, validly existing and in full force and effect under the Laws of the State of Delaware. Buyer has full limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

**Section 4.02     No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of organization, operating agreement or

other organizational documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

**Section 4.03    Investment Purpose.** Buyer acknowledges that no federal or state agency has made any finding or determination as to the fairness of the transfer of the Membership Interests nor any recommendation or endorsement of the Membership Interests. Buyer is acquiring the Membership Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Membership Interests are not registered under the Securities Act of 1933, as amended (the **"Act"**), or any state securities laws, and that the Membership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. The purchase and sale of the Membership Interests is being made in reliance upon exemptions from the registration requirements of the Act and state securities laws. Because the Membership Interests have not been registered, Buyer understands and agrees that the Membership Interests cannot be sold by it until registered under the Act and applicable State securities law unless an exemption from such registration is available.

**Section 4.04    Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 4.05    Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 4.06    As Is Where Is.** Except for the Seller's express representations and warranties in Article III, the Membership Interests are sold, and the Membership Interests and assets of the Company accepted, **AS IS WHERE IS** and without warranty of any kind, whether express or implied, including, without limitation, any warranty of title, merchantability, condition or fitness for a particular purpose. Buyer has had a sufficient opportunity to investigate the financial records and assets of the Company, and,

prior to Closing, Buyer shall have inspected the finances, assets and condition of the Company to its satisfaction and will accept the Membership Interest "as is," "where is," and "with all faults" and in their present condition and state of repair subject only to Seller's express representations and warranties in this Agreement.

## ARTICLE V

### COVENANTS

**Section 5.01    Resignations.** Seller shall deliver to Buyer written resignations, effective as of the Closing Date, of the officers and directors of the Company set forth on **Section 5.01** of the Disclosure Schedules/requested by Buyer at least five (5) Business Days prior to the Closing.

**Section 5.02    Confidentiality.** From and after the Closing, Seller shall hold in confidence any and all information, whether written or oral, concerning the Company, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller; or (b) is lawfully acquired by Seller from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller is compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.03    Non-competition; Non-solicitation**

(a)    For a period of five (5) commencing on the Closing Date (the "**Restricted Period**"), Dan Peterson and Michelle Marie Peterson shall not, directly or indirectly, (i) engage in or assist others in engaging in the Restricted Business in the Territory; (ii) have an interest in any Person that engages in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Execution Date) between the Company and customers or suppliers of the Company. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)    During the Restricted Period, Seller shall not directly or indirectly, hire or solicit any employee of the Company or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed

specifically to any such employees; *provided, that* nothing in this **Section 5.03(b)** shall prevent Seller from hiring any employee whose employment has been terminated by the Company or Buyer.

(c)     During the Restricted Period, Seller shall not directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients or customers of the Company or potential clients or customers of the Company for purposes of diverting their business or services from the Company.

(d)     Seller acknowledges that a breach or threatened breach of this **Section 5.03** would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(e)     Seller acknowledges that the restrictions contained in this **Section 5.03** are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 5.03** should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in this **Section 5.03** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 5.04    Books and Records.**

(a)     In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of three (3) years after the Closing, Buyer shall:

(i)     retain the books and records (including personnel files) of the Company relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Company; and

(ii)     upon reasonable notice, afford the Representatives of Seller reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such books and records;

*provided, however*, that any books and records related to Tax matters shall be retained pursuant to the periods set forth in **Article VI**.

(b)     In order to facilitate the resolution of any claims made by or against or incurred by Buyer or the Company after the Closing, or for any other reasonable purpose, for a period of three (3) years following the Closing, Seller shall:

(i)     retain the books and records (including personnel files) of Seller which relate to the Company and its operations for periods prior to the Closing; and

(ii)     upon reasonable notice, afford the Representatives of Buyer or the Company reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records;

*provided, however*, that any books and records related to Tax matters shall be retained pursuant to the periods set forth in **Article VI**.

(c)     Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this **Section 5.04** where such access would violate any Law.

**Section 5.05     Public Announcements.** Unless otherwise required by applicable Law [or Membership Interests exchange requirements (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 5.06     Further Assurances.** Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## ARTICLE VI

### TAX MATTERS

**Section 6.01     Pro Rations.** Rent, utility charges, maintenance and repair charges, real estate and all other taxes payable under any assumed lease and all other items of expense and other similar obligations to third parties shall be prorated between Seller and Buyer as of the Closing Date. The financial books and records of the Company shall be closed as of the Closing Date. Buyer shall be responsible for the financial books and records of the Company after the Closing Date; provided, however, Buyer shall not alter or amend the books and records for any period prior to the Closing Date, or

27

amend or modify any tax return for any period prior to the Closing Date, without the express written consent of the Seller

**Section 6.02    Outside of Closing.** The parties agree to make payments to each other outside of the Closing on a timely basis with respect to adjustments not ascertainable on the Closing Date when the correct amount of any amounts to be adjusted or apportioned are ascertained.

**Section 6.03    Tax Covenants.** Without the prior written consent of Buyer, Seller (and, prior to the Closing, the Company and its Representatives) shall not, to the extent it may affect, or relate to, the Company, make, change or rescind any Tax election, amend any Tax Return or take any position on any Tax Return, take any action, omit to take any action or enter into any other transaction that would have the effect of increasing the Tax liability or reducing any Tax asset of Buyer or the Company in respect of any Post-Closing Tax Period. Seller agrees that Buyer is to have no liability for any Tax resulting from any action of Seller, the Company and their respective Representatives, and agrees to indemnify and hold harmless Buyer (and, after the Closing Date, the Company) against any such Tax or reduction of any Tax asset.

All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Buyer shall cooperate with respect thereto as necessary).

Buyer shall prepare, or cause to be prepared, all Tax Returns required to be filed by the Company after the Closing Date with respect to a Pre-Closing Tax Period. Any such Tax Return shall be prepared in a manner consistent with past practice (unless otherwise required by Law) and without a change of any election or any accounting method and shall be submitted by Buyer to Seller (together with schedules, statements and, to the extent requested by Seller, supporting documentation) at least 45 days prior to the due date (including extensions) of such Tax Return. If Seller objects to any item on any such Tax Return, it shall, within ten (10) days after delivery of such Tax Return, notify Buyer in writing that it so objects, specifying with particularity any such item and stating the specific factual or legal basis for any such objection. If a notice of objection shall be duly delivered, Buyer and Seller shall negotiate in good faith and use their reasonable best efforts to resolve such items. If Buyer and Seller are unable to reach such agreement within ten (10) days after receipt by Buyer of such notice, the disputed items shall be resolved by the Independent Accountant and any determination by the Independent Accountant shall be final. The Independent Accountant shall resolve any disputed items within twenty (20) days of having the item referred to it pursuant to such procedures as it may require. If the Independent Accountant is unable to resolve any disputed items before the due date for such Tax Return, the Tax Return shall be filed as

prepared by Buyer and then amended to reflect the Independent Accountant's resolution. The costs, fees and expenses of the Independent Accountant shall be borne equally by Buyer and Seller. The preparation and filing of any Tax Return of the Company that does not relate to a Pre-Closing Tax Period shall be exclusively within the control of Buyer.

**Section 6.04      Straddle Period.** In the case of Taxes that are payable with respect to a taxable period that begins before and ends after the Closing Date (each such period, a "**Straddle Period**"), the portion of any such Taxes that are treated as Pre-Closing Taxes for purposes of this Agreement shall be:

(a)      in the case of Taxes (i) based upon, or related to, income, receipts, profits, wages, capital or net worth, (ii) imposed in connection with the sale, transfer or assignment of property, or (iii) required to be withheld, deemed equal to the amount which would be payable if the taxable year ended with the Closing Date; and

(b)      in the case of other Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

**Section 6.05      Cooperation and Exchange of Information.** Seller and Buyer shall provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return pursuant to this **Article VI** or in connection with any audit or other proceeding in respect of Taxes of the Company. Such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by tax authorities. Each of Seller and Buyer shall retain all Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Company for any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods. Prior to transferring, destroying or discarding any Tax Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Company for any taxable period beginning before the Closing Date, Seller or Buyer (as the case may be) shall provide the other party with reasonable written notice and offer the other party the opportunity to take custody of such materials.

## ARTICLE VII

### CONDITIONS TO CLOSING

**Section 7.01      Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or

29

prior to the Closing, of each of the following conditions: Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities and any third parties referred to on **Schedule 3.05**, such as Seller's landlord, and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in **Section 4.02**, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

**Section 7.02    Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    No Action shall have been commenced against Buyer, Seller or the Company, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(b)    All approvals, consents and waivers that are listed on **Section 3.05** of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Buyer at or prior to the Closing.

(c)    The Transaction Documents (other than this Agreement) shall have been executed and delivered by the parties thereto and true and complete copies thereof shall have been delivered to Buyer.

(d)    Buyer shall have received a certificate of Seller certifying that attached thereto are true and complete copies of all resolutions adopted by the Member of Seller authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(e)    Buyer shall have received resignations of the directors and officers of the Company pursuant to **Section 5.01**.

(f)    Seller shall have delivered to Buyer a good standing certificate (or its equivalent) for the Company from the secretary of state or similar Governmental Authority of the jurisdiction under the Laws in which the Company is organized.

(g)    Seller shall have delivered, or caused to be delivered, to Buyer the duly executed Transfer Power transferring the Membership Interests, free and clear of Encumbrances,

(h)    Seller shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.03    Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

(b)    The Transaction Documents (other than this Agreement) shall have been executed and delivered by the parties thereto and true and complete copies thereof shall have been delivered to Seller.

(c)    Seller shall have received a certificate of the Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the members of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(d)    Buyer shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(e)    Buyer and Seller shall have obtained the consents from the landlords of the office lease and the storage unit lease to release Dan Peterson from his personal guarantee on such leases.

## ARTICLE VIII

### INDEMNIFICATION

**Section 8.01    Survival.** The representations and warranties contained herein (other than any representations or warranties contained in **Section 3.22** which are subject to **Article VI**) shall survive the Closing and shall remain in full force and effect until the date that is two (2) years from the Closing Date; *provided, that* the representations and warranties in (a) **Section 3.01**, **Section 3.03**, **Section 3.24**, **Section 4.01** and **Section 4.04** shall survive indefinitely, (b) **Section 3.19** shall survive for a period of five (5) years after the Closing; and (c) **Section 3.20** shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

31

**Section 8.02    Indemnification.**

(a)    **Indemnification by Seller.**  Subject to the other terms and conditions of this **Article VIII**, Seller shall indemnify and defend Buyer and its Representative ("**Buyer Indemnitees**") against, and shall hold the Buyer Indemnitees harmless from and against, and shall pay and reimburse them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer based upon, arising out of, with respect to or by reason of:

(i)    Any material inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement or in any certificate or instrument delivered by or on behalf of Seller pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(ii)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement; and

(iii)    any services provided by the Company prior to the Closing Date.

(b)    **Indemnification by Buyer.**  Subject to the other terms and conditions of this **Article VIII**, Buyer shall indemnify and defend Seller and its Representatives ("**Seller Indemnitees**") against, and shall hold the Seller Indemnitees harmless from and against, and shall pay and reimburse them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer based upon, arising out of, with respect to or by reason of:

(i)    Any material inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement, as of the date such representation or warranty was made or as if such representation or warranty was made on and as of the Closing Date (except for representations and warranties that expressly relate to a specified date, the inaccuracy in or breach of which will be determined with reference to such specified date);

(ii)    any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; and

(iii)    any services provided by the Company after to the Closing Date..

**Section 8.03    Certain Limitations**.  Seller shall not be liable to the Buyer Indemnitees for indemnification under **Section 8.02(a)** until the aggregate amount of all Losses in respect of

indemnification under **Section 8.02(a)** exceeds $1,000, in which event Seller shall be required to pay or be liable for all such Losses from the first dollar. Further, Buyer and Seller agree to use their good faith efforts to mutually resolve any claim that such party may have hereunder prior to asserting a formal indemnification claim to the Escrow Agent.

      **Section 8.04**    **Indemnification Procedures.** The party making a claim under this **Article VIII** is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this **Article VIII** is referred to as the "**Indemnifying Party**".

      (a)    **Third Party Claims.** If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third Party Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense; *provided, that* if the Indemnifying Party is Seller, such Indemnifying Party shall not have the right to defend or direct the defense of any such Third Party Claim that (x) is asserted directly by or on behalf of a Person that is a supplier or customer of the Company, or (y) seeks an injunction or other equitable relief against the Indemnified Party. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 8.04(b)**, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party, *provided, that* if in the reasonable opinion of counsel to the Indemnified Party, (A) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (B) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party shall be liable for the reasonable fees

PETERSON_000105

and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 8.04(b)**, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available (subject to the provisions of **Section 5.02**) records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)     **Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this **Section 8.04(b)**. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten (10) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 8.04(a)**, it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c)     **Direct Claims.** Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than thirty (30) days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include

34
PETERSON_000106

copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. The Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Company's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30) day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 8.05    Payments.** Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this **Article VIII**, the Indemnifying Party shall satisfy its obligations within fifteen (15) Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds.    Notwithstanding, Buyer agrees that for any payment due Buyer hereunder for a valid indemnifiable claim, Buyer shall first withdraw payment from the Holdback Amount and setoff against the payment owed to Seller under the Promissory Note, in that order, and if payment is not made out of the Holdback Amount or setoff against the Promissory Note or a balance remains after payment is made out of the Holdback Amount or setoff against the Promissory Note, then Seller shall be obligated to pay the amount of such payment to Buyer.   The parties hereto agree that should any party not make full payment of any such obligations within such fifteen (15) Business Day period, any amount payable shall accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to the date such payment has been made at a rate per annum equal to the then current Applicable Federal Rate for short-term loans. Such interest shall be calculated daily on the basis of a 365 day year and the actual number of days elapsed.

**Section 8.06    Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 8.07    Exclusive Remedies.** Subject to **Section 5.03**, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud, criminal activity or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement,

shall be pursuant to the indemnification provisions set forth in this **Article VIII**. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this **Article VIII**. Nothing in this **Section 8.07** shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled or to seek any remedy on account of any party's fraudulent, criminal or intentional misconduct.

## ARTICLE IX

### MISCELLANEOUS

**Section 9.01     Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 9.02     Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 9.02**):

If to Seller:                             Dan Peterson

                                          9141 E. Sutton Dr.

                                          Scottsdale, AZ 85260

                                          Facsimile:     N/A

                                          E-mail: dan@petersoncompany.com

                                          Attention:     Dan Peterson

with a copy to:                           DiCarlo Caserta & McKeighan PLC

                                          20715 N. Pima Rd., Ste. 108

                                          Scottsdale, AZ 85255

                                          Facsimile:  (480) 429-7552

PETERSON_000108

|                   |                                        |
|-------------------|----------------------------------------|
|                   | E-mail: jdm@dcmplaw.com                |
|                   | Attention: Jace McKeighan              |
| If to Buyer:      | OnPoint Property Tech, Inc.            |
|                   | 501 E. Las Olas Blvd. #319             |
|                   | Ft. Lauderdale, FL 33301               |
|                   | E-mail: chris.jurasek@gmail.com        |
|                   | Attention: Chris Jurasek               |
| with a copy to:   | Brouse McDowell, LPA                   |
|                   | 388 South Main St., Ste. 500           |
|                   | Akron, OH 44311                        |
|                   | Facsimile: 330 253-8601                |
|                   | E-mail: eyeargin@brouse.com            |
|                   | Attention: Elizabeth G. Yeargin, Esq.  |

**Section 9.03    Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.04    Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05    Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in **Section 5.03(e)**, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this

Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.06    Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 9.07    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed; *provided, however*, that prior to the Closing Date, Buyer may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries or an Affiliate. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.08    No Third-party Beneficiaries.** Except as provided in **Article VIII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.09    Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10    Governing Law; Arbitration.**

PETERSON_000110

(a)      This Agreement shall be governed by and construed sole and exclusively in accordance with the internal laws of the State of Arizona without giving effect to any choice or conflict of law provision or rule (whether of the State of Arizona or any other jurisdiction).

(b)      If the parties are unable to resolve any dispute arising out of this Agreement either during or after its term informally, including the question as to whether any particular matter is arbitrable, the parties agree to submit the matter to binding arbitration by filing a demand for arbitration with the Dallas, Texas regional office of the American Arbitration Association ("AAA").  A single arbitrator shall be appointed in accordance with the then existing Commercial Arbitration Rules of the AAA.  The parties also agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to the proceedings.  Discovery may be conducted either upon mutual consent of the parties, or by order of the arbitrator upon good cause being shown. In ruling on motions pertaining to discovery, the arbitrator shall consider that the purpose of arbitration is to provide for the efficient and inexpensive resolution of disputes, and the arbitrator shall limit discovery whenever appropriate to insure that this purpose is preserved. The dispute between the parties shall be submitted for determination within sixty (60) days after the arbitrator has been selected. The decision of the arbitrator shall be rendered within thirty (30) days after the conclusion of the arbitration hearing. The decision of the arbitrator shall be in writing and shall specify the factual and legal basis for the decision. Upon stipulation of the parties, or upon a showing of good cause by either party, the arbitrator may lengthen or shorten the time periods set forth herein for conducting the hearing or for rendering a decision. The decision of the arbitrator shall be final and binding upon the parties. Judgment to enforce the decision of the arbitrator, whether for legal or equitable relief, may be entered in any court having jurisdiction thereof, and the parties hereto expressly and irrevocably consent to the jurisdiction of the Dallas, Texas courts for such purpose. The Uniform Rules of Procedure for Arbitration shall not apply to any arbitration proceeding relating to the subject matter or terms of the documents. In the event a dispute is submitted to arbitration pursuant to this Section, the prevailing party shall be entitled to the payment of its reasonable attorneys' fees and costs, as determined by the arbitrator. Each of the parties shall keep all disputes and arbitration proceedings strictly confidential, except for disclosures of information required by applicable law or regulation.

**Section 9.11     Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[signature page follows]

39

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

"Seller"

By_____

Dan Peterson, as Trustee of the
Dan D. Peterson Living Trust
dated April 2, 2009

"Buyer"

OnPoint Acquisitions, LLC

By_____

Name: Chris Jurasek

Title:  President

For purposes of Section 5.03:

By_____

Dan Peterson, an individual

By_____

Michelle Marie Peterson, an individual

*Signature Page to Membership Interest Purchase Agreement*

<u>Exhibit A</u>

## CONSULTING AGREEMENT

This Consulting Agreement ("<u>Agreement</u>") is entered into effective as of October 31, 2019, between Dan Peterson, an individual, ("<u>Consultant</u>") and Dan Peterson Property Management, LLC, an Arizona limited liability company (the "<u>Company</u>").

RECITALS

A.      Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009 ("<u>Seller</u>") and OnPoint Acquisitions, LLC, a Delaware limited liability company ("<u>Buyer</u>") have entered into that certain Membership Interest Purchase Agreement for Buyer's purchase from Seller all of the membership interests in the Company, dated effective as of October 31, 2019    (the "<u>Purchase Agreement</u>").

B.      The Consultant has valuable knowledge of and experience in the current business operations of the Company. As such, the Company desires to continue to utilize such knowledge and experience of Consultant; and

C.      Consultant agrees to provide services to the Company as contemplated herein.

AGREEMENTS

In consideration of the covenants set forth in this Agreement, the parties agree as follows:

1.      <u>Consulting Term and Services</u>.

(a)      *Consulting Term.*  The period during which Consultant is engaged under this Agreement (the "<u>Consulting Term</u>") shall start on the date hereof and continue for a period of thirty-six (36) months, subject to the termination provisions set forth in Section 12 below.  The Consulting Term may be extended upon the mutual written agreement of the Company and Consultant.

(b)      *Consulting Services.*  Consultant shall exclusively perform consulting services for the Company as reasonably requested and directed by the officers of the Company to assist the Company and to provide general advisory services relating to the business of the Company, including company strategy, daily operations, and industry relationship building (the "<u>Consulting Services</u>").  During the Consulting Term, Consultant shall devote approximately ten (10) hours per week to the Consulting Services as reasonably requested by the Company. Consultant hereby warrants that the Consulting Services shall be performed in a competent and professional manner in accordance with industry standards.  Consultant acknowledges and agrees that Company owns the deliverables provided to Company as part of the Consulting Services under this Agreement.

41

2.      Consulting Fee; Expenses; Invoices.   The Company shall pay Consultant for the Consulting Services in accordance with the terms set forth below (the "Consulting Fee"):

(a)      *Monthly Fee.* The Company shall pay Consultant a monthly fee of Two Thousand Five Hundred Dollars ($2,500.00) to engage Consultant as the Company's licensed real estate broker in the State of Arizona and to provide other Consulting Services to the Company during the Consulting Term. The Monthly Fee shall be payable on the first (1st) day of each month.

(b)      *Referral Commission.* The Company shall pay Consultant five percent (5%) of the annual property management fee set forth in the property management contract between the association and the Company for the 1st year payable within 30 days of commencement of the property management contract for any referral that results in a new contract executed by a homeowners' association and the Company.

(c)      *Transaction Commission.* The Company shall pay Consultant six percent (6%) of the transaction value for any off-market referrals of property management companies that lead to a successful acquisition by the Company which closes during the Consulting Term.

(d)      *Rental Commission.* The Company intends to expand its business operations to include the management of rentals properties (the "Rental Property Management"). If, during the Consulting Term, Consultant agrees to provide additional consulting services related to the Rental Property Management, the Company and Consultant agree to negotiate, in good faith, to determine an appropriate fee to compensate Consultant for his services.

(e)      *Lien Services. Lien Services.* Consultant shall serve as a certified legal document preparer ("CLDP") for the Company for the purpose of preparing and recording liens and lien releases related to the property management services. The Company shall pay consult a fee of $100.00 for each lien or lien release prepared by Consultant. Consultant shall maintain his CLDP license during the term of this Agreement; provided, however, that Company shall reimburse Consultant for all out-of-pocket expenses related thereto which have been approved in advance by the Company in writing, including but not limited to the annual license fees.

(f)      *Expenses.* Consultant shall be entitled to reimbursement for pre-approved ordinary, necessary and reasonable out-of-pocket business expenses which Consultant incurs in connection with performing Consultant's duties under this Agreement and have been approved in advance in writing, including reasonable travel and meal expenses. The reimbursement of all such expenses shall be made in accordance with the Company's customary practices and policies (including presentation of receipts or other evidence documenting the amounts and nature of such expenses).

(g)      *Invoices.* Consultant will invoice Company monthly for items (b) through (f) above with detail and, where appropriate, supporting documentation. Each invoice will be due and payable thirty (30) days from its date.

PETERSON_000114

3.      Definitions.

(a) "Business" means the business activities conducted by or planned to be undertaken by the Company through the Termination Date of this Agreement, including any business involving property management services (including the marketing and listing property for rent, contracting with property owners and brokers, collecting rent payments, managing tenants, identifying competitive markets, forming industry relationships, and other services provided by the Company) and the provision of related services.

(b) "Business Associate" means any employee, contractor, subcontractor, representative, consultant or agent of the Company or any of its affiliates who is acting in such capacity as of the Termination Date or has acted in such capacity at any time within the six-month period immediately preceding the date of hire, recruitment, solicitation, or retention.

(c) "Confidential Information" means information regarding the Business or Company that has not been disclosed by duly authorized agents of the Company to the public and is not known to the general public, and which shall include, but not be limited to, the following with respect to the Business or Company: (i) information regarding operations, assets, liabilities or financial condition; (ii) information regarding bidding, quotations, price, sales, merchandising, marketing and promotions (including marketing strategies and concepts), advertising campaigns, capital expenditures, costs, joint ventures, business alliances, products, services or purchasing; (iii) information regarding the terms, conditions and employment relationship the Company has with employees, including, non-public information regarding their monetary compensation, benefits and employee personnel files; (iv) information regarding Business Associates (other than employees), including their identities, responsibilities, qualifications, benefits, compensation and files; (v) customer lists, databases and other information related to current or prospective customers, including information regarding their identities, contact persons and purchasing patterns; (vi) information regarding current or prospective vendors, suppliers, distributors or other business partners; (vii) forecasts, projections, budgets and business plans; (viii) information regarding the planned or pending acquisitions, divestitures or other business combinations; (ix) technical information, models, know-how, protocols, discoveries, techniques, processes, business methods, trade secrets and proprietary information; and (x) contemplated website designs, website content, domain names, data bases, internet hyperlinks, internet banners and internet search engine listings. Notwithstanding the foregoing, Confidential Information shall be treated as such under this Agreement unless and until it becomes generally known to the public through no act or fault of Consultant on or after the date hereof.

(d) "Termination Date" means the date of termination of this Agreement.

4.      Independent Contractor.  Consultant is an independent contractor with respect to the Company. No other relationship is intended to be created between the parties hereto. Without limitation of the foregoing, Consultant shall not be an employee of the Company during the Consulting Term, and this Agreement is not an employment contract. Nothing in this Agreement shall be construed as (a) giving Consultant any rights as a partner, manager, member, shareholder or owner of the Company or any of its affiliates, or (b) entitling Consultant to control in any manner the conduct of the business of the Company or any of its affiliates.

5.      Non-Compete and Non-Solicitation.  Consultant acknowledges that he is bound by the terms of Section 5.03 of the Purchase Agreement governing non-competition and non-solicitation and that compliance with such obligations shall be a condition of payment under this Agreement.

6.      Confidential Information.  Consultant acknowledges that he is bound by the terms of Section 5.06 of the Purchase Agreement governing confidentiality and that compliance with such obligations shall be a condition of payment under this Agreement.

7.      Notices.  All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by electronic exchange, or by nationally recognized private courier. Notices delivered by hand, by facsimile, by electronic exchange, or by nationally recognized private carrier shall be deemed given on the day of receipt; provided, however, that a notice delivered by facsimile or electronic exchange shall only be effective if such notice is also delivered by hand, nationally recognized private courier or deposited in the United States mail, postage prepaid, registered or certified mail, on or before two (2) business days following its delivery by facsimile. All notices shall be addressed as follows: If to the Company: Chris Jurasek, President, OnPoint Acquisitions , LLC, 501 E. Las Olas Blvd. #319, Ft. Lauderdale, FL 33301. If to Consultant: Dan Peterson, 9141 E. Sutton Dr., Scottsdale, AZ 85260.

8.      Applicable Law.  This Agreement shall be governed by the internal laws of the State of Delaware, without giving effect to any choice of laws rules that would require the application of the laws of any other jurisdiction. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement must be exclusively brought against either of the parties in the courts of the State of Delaware, or, if it has or can acquire jurisdiction, in the United States District Court having jurisdiction in such State. Each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

9.      Scope of Covenants.  Consultant acknowledges that the territorial, time and activity limitations set forth in Sections 5 and 6 (or the lack thereof, as the case may be) are reasonable and are properly required for the protection of the Company. If any such territorial, time or activity limitation (or lack

thereof) is determined to be unreasonable by a court or other tribunal, the parties agree to the reduction of such territorial, time or activity limitations (including the imposition of such a limitation if it is missing) to such an area, period or scope of activity as said court or tribunal shall deem reasonable under the circumstances. Also, if the Company seeks partial enforcement of Sections 5 or 6 as to only a territory, time and scope of activity which is reasonable, then the Company shall be entitled to such reasonable partial enforcement. If such reduction or (if the Company seeks partial enforcement) such partial enforcement is not possible, then the unenforceable provision or portion thereof shall be severed as provided in Section 10. Consultant agrees that sections 5 and 6 shall survive termination of this Agreement.

10.     Severability. Subject to Section 11, if any provision of this Agreement or portion thereof is determined by a court or other tribunal to be wholly or partially unenforceable in any jurisdiction, then (for purposes of such jurisdiction) such provision or portion thereof shall be struck from the remainder of this Agreement, which shall remain in full force and effect. In the event Consultant violates any obligation contained in this Agreement, the time period provided for with respect to such obligation shall be tolled (*i.e.*, shall not run) as to that party for so long as he is in breach thereof.

11.     Remedies. The remedies of each party hereunder shall be cumulative and concurrent, and may be pursued singularly, successively, or together, in such party's discretion. Consultant agrees that any violation by Consultant of Sections 5 or 6 would cause irreparable harm to the Company. Without limitation of the generality of the foregoing, if Consultant violates any provision of Sections 5 or 6 then the Company shall be entitled, in addition to any other remedies that it may have, to specific, injunctive or other equitable relief (without the requirement of posting of a bond or other security) in order to enforce such provision.

12.     Termination.

        (a)     After October 31, 2020, the Company may terminate this Agreement at any time upon thirty (30) days' prior written notice.

        (b)     Either party may terminate this Agreement should the other party materially breach the terms and conditions of this Agreement, and such breach goes uncured for a period of fifteen (15) or more days after the non-breaching party has notified the breaching party in writing.

13.     Complete Agreement; Amendments. This Agreement (and any other written agreement(s) of even date herewith between the parties concerning the subject matter hereof) (a) contains the complete agreement of the parties regarding the subject matter hereof; and (b) supersedes any prior agreements, representations or warranties between the parties regarding the subject matter hereof. Each schedule and exhibit hereto shall be deemed part of this Agreement. No amendment hereto shall be enforceable unless in writing and signed and delivered by the party against whom it is to be enforced.

14.     Successors.  This Agreement shall be for the benefit of and binding upon: (a) Consultant's heirs, legatees and personal representatives; and (b) the Company's successors and assigns (it being understood that this Agreement is not assignable by Consultant).

15.     Waivers.  No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No course of dealing will be deemed to amend, waive or discharge any part of this Agreement or any of the rights or obligations of any person under this Agreement.

16.     Counterparts; Facsimiles.  This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one agreement.  Furthermore, delivery of a copy of such signature by facsimile transmission or other electronic exchange methodology shall constitute a valid and binding execution and delivery of this Agreement by such party, and such electronic copy shall constitute an enforceable original document.

*(Signature Page to Follow)*

PETERSON_000118

Intending to be legally bound, the parties execute this Consulting Agreement as of the date first written above.

_____

DAN PETERSON, Individually

ONPOINT ACQUISITIONS, LLC

_____

Name:  Chris Jurasek

Title:  President

*Signature Page to Consulting Agreement*

Exhibit B

## PLEDGE AND SECURITY AGREEMENT

THIS PLEDGE AND SECURITY AGREEMENT (as the same may from time to time be amended, restated or otherwise modified, this "Agreement") is made effective as of the 31st day of October, 2019, by **OnPoint Acquisitions, LLC**, a Delaware limited liability company (together with its successors and assigns, "Pledgor"), in favor of **Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009**, a revocable trust formed under the laws of the State of Arizona ("Pledgee"), for the benefit of Pledgee, as hereinafter defined.

### Recitals:

A.       Pledgor and Pledgee have entered into a Membership Interest Purchase Agreement dated effective as of October 31, 2019 (the "Purchase Agreement"), pursuant to which Pledgor purchased all of Pledgee's issued and outstanding membership interests in Dan Peterson Property Management, LLC, an Arizona limited liability Company (the "Company") described on **Exhibit A** hereto (the "Ownership Interests");

B.       Pursuant to Section 2.04 of the Purchase Agreement, Pledgor executed a promissory note in favor of Pledgee (the "Note");

C.       A condition of the Purchase Agreement is that the obligations of Pledgor to the Pledgee under the Promissory Note are secured by a pledge of the Ownership Interests, as set forth in the Purchase Agreement; and

D.       As security for the obligations of Pledgor to Pledgee under the Promissory Note, Pledgor has agreed to enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor and Pledgee agree as follows:

1.       Creation of Security Interest in Ownership Interests. Pledgor hereby assigns and agrees to deliver to and deposit immediately with Pledgee and hereby pledges, mortgages and grants to Pledgee a security interest in and to the Ownership Interests, to secure performance by Pledgor of Pledgor's obligations under this Agreement and to secure the payment of the Pledgor's obligation to Pledgee under the Note.

2.       Representations and Warranties. Pledgor hereby represents and warrants to Pledgee as follows:

a.       Pledgor is the record and beneficial owner of the Ownership Interests and has good and marketable title to such Ownership Interests free and clear of all liens, charges, encumbrances or other adverse claims of any kind, nature or description.

b.       Pledgor has the full and absolute right and authority to enter into and perform under this Agreement and to consummate the transactions contemplated hereby and neither the execution and delivery of this Agreement by Pledgor, nor the performance by Pledgor of her obligations hereunder, violate or constitute a breach of any of the terms or provisions of, or constitute a default or accelerate any obligations of Pledgor under any instrument, agreement or other document to which Pledgor is a party or by which Pledgor is bound.

c.      Pledgor shall at all times uses its best efforts to promote the interests of the Company and its business, and shall operate the business in the ordinary course as its exclusive property management company in the State of Arizona.

d.      Pledgor will pay all costs reasonably necessary to preserve and enforce this Agreement.

e.      Pledgor shall, no more frequently than monthly, furnish Pledgee with any information concerning the Ownership Interests reasonably requested by Pledgee, including but not limited to financial statements, bank and account statements, and other similar information concerning the performance and/or financial condition of the Company.

f.      Pledgor shall conduct any and all business in the State of Arizona exclusively through the Company.

g.      Pledgor shall not without the Pledgee's prior written consent, which shall not be unreasonably withheld, transfer, assign, or in any way convey any Company account, client or contract.

h.      Pledgor shall not without the Pledgee's prior written consent, which shall not be unreasonably withheld, cause the Company to borrow funds, encumber or lien the assets of the Company, or allow the assets of the Company to become an accession to other goods.

i.      Pledgor shall not without the Pledgee's prior written consent, which shall not be unreasonably withheld, sell, lease or otherwise transfer the assets of the Company except in the ordinary course of business.

Notwithstanding any of the foregoing, Pledgor may transfer and/or assign the assets, equity and/or business of the Company to Pledgor or an affiliate or subsidiary of Pledgor (the "Transferee"), in which case Pledgee shall be granted a pledge of equal value and in form and substance substantially similar to this Agreement in the equity of the Transferee. Such a transfer shall not be deemed a breach of Pledgor's obligations, representations or warranties or an Event of Default hereunder.

3.      Delivery and Holding of Ownership Interests.  Simultaneously with execution of this Agreement, Pledgor shall deliver to and deposit with the Pledgee certificates evidencing any of the Ownership Interests, endorsed in blank by Pledgor or with fully executed assignments of membership interests in the form attached hereto as **Exhibit B**, in the case of uncertificated membership interests, in all respects in good and sufficient form under applicable law for delivery and transfer; provided, however, that Pledgor shall retain all incidents of beneficial ownership of such Ownership Interests including, but not limited to, the right to vote the Ownership Interests and the right to receive distributions for so long as an Event of Default (as defined in Section 6) has not occurred and is not continuing without waiver or cure.

4.      Transfer of Ownership Interests.  Pledgor will not sell, assign, transfer, or dispose of the Ownership Interests, or any part thereof, without the prior written consent of Pledgee, which consent may not be unreasonably withheld.

5.      Covenants of Pledgor.  During the term of this Agreement, Pledgor shall, upon Pledgee's request, take any action reasonably deemed necessary by Pledgee to establish, perfect, determine the priority of, continue or enforce Pledgee's interest in the Ownership Interests or rights under this Agreement.

6.      Events of Default.  The happening of any of the following events or conditions shall constitute a default ("Event of Default") under this Agreement:

      a.   any failure by Pledgor to pay amounts due to Pledgee under the Note;

      b.   any failure by Pledgor to perform or comply with any representation, warranty, covenant or agreement contained herein or in the Note;

      c.   The occurrence of a sale or transfer of any or all of the Ownership Interests not in compliance with this Agreement; or

      d.   Any failure by Pledgor to actively operate the Company's property management business for a period of (a) ten (10) consecutive days or (b) twenty (20) days within any given calendar month.

7.  <u>Remedies</u>.  Upon the occurrence of any Event of Default hereunder Pledgee shall have all the rights and remedies of a secured party under the Delaware Uniform Commercial Code, as well as all rights and remedies at law or in equity provided by any other applicable law.  In addition, Pledgee shall have, upon the occurrence of any Event of Default hereunder, and to the extent permitted under the Delaware Uniform Commercial Code, the right to make a public or private sale of the Ownership Interests at which Pledgee may bid, and the right to apply any proceeds of any sale of the Ownership Interests to the satisfaction of the obligations hereby secured in such order, amounts and manner which Pledgee, in its sole discretion, may determine.  All rights, remedies or powers conferred upon Pledgee herein or by law shall be cumulative.  Pledgor shall be entitled to any proceeds of any sale in excess of the amount owed to Pledgee at the time of default.  Pledgor will be liable for all reasonable costs or expenses (including reasonable attorneys' fees and expenses) incurred in connection with the enforcement of this Agreement.

8.  <u>No Waivers</u>.  No delay, omission, or forbearance by Pledgee in the exercise of any right, power or remedy conferred upon it herein or by law, shall be a waiver of any future right, power or remedy, or a waiver or excuse of an event giving rise to the same.  Pledgee's election to waive an Event of Default does not constitute a future waiver of subsequent default on any obligation of Pledgor.

9.  <u>Release of Ownership Interests</u>.  Pledgee agrees that, upon the payment of all amounts due under the Note and the performance of all of the Pledgor's obligations herein, Pledgee will release its security interest hereunder in the Ownership Interests and deliver the Ownership Interests to Pledgor.

10.  <u>Notices</u>.  All notices provided or permitted by this Agreement shall be in writing.  All notices shall be deemed given when hand delivered or mailed by certified or registered mail, postage prepaid.

11.  <u>Entire Agreement</u>.  This Agreement and the Note and any agreement or document delivered in connection therewith, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

12.  <u>Successor and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld or delayed.

13.  <u>Headings</u>.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

14. <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a future waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

15. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

16. <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction). Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

17. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[signature page follows]

PETERSON_000123

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

PLEDGOR

OnPoint Acquisitions, LLC

By: _____

Chris Jurasek, President

PLEDGEE:

By: _____

Dan Peterson, as Trustee of
the Dan D. Peterson Living Trust
dated April 2, 2009

*Signature Page to Pledge and Security Agreement*

**Exhibit A**

Ownership Interests

Company                                                    Membership Interests

Dan Peterson Property Management, LLC                              100%

## ASSIGNMENT OF LLC INTERESTS

For good and valuable consideration, OnPoint Acquisitions, LLC ("Assignor"), hereby transfers, assigns and sets over unto Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009 ("Assignee"), all of its limited liability company interests (the "LLC Interests") in Dan Peterson Property Management, LLC (the "LLC"), which LLC Interests include Assignor's right, title and interest in and to the LLC's assets and Assignor's capital account, allocable share of future profits and losses, and distributive share of distributions of Assignor, subject to the terms of the attached Pledge and Security Agreement and the Note. Assignee's rights to allocable shares of future profits and losses, distributive shares of distributions, and rights to the LLC's assets trigger only upon event of default as described in the documents identified in this Paragraph.

TO HAVE AND TO HOLD the LLC Interests unto Assignee, its successors and assigns, and Assignor hereby warrants unto Assignee, its successors and assigns that Assignor has good right, power and authority to assign the LLC Interests; that Assignor is the owner of the LLC Interests; and that the LLC Interests have not been pledged or encumbered by Assignor and no other party has any other rights to the LLC Interests or the economic benefits thereof.

IN WITNESS WHEREOF, this Assignment of LLC Interests is effective as of this 31st day of October, 2019.

OnPoint Acquisitions, LLC

By: _____

Chris Jurasek, President

Exhibit C
**PROMISSORY NOTE**

**$800,000.00**                                                                Dated: October 31, 2019

For value received, the receipt and adequacy of which are hereby acknowledged, the undersigned, **ONPOINT ACQUISITIONS, LLC** (the *"Maker"*), jointly and severally promises to pay to the order of **DAN PETERSON, AS TRUSTEE OF THE DAN D. PETERSON LIVING TRUST DATED APRIL 2, 2009** (the "*Holder*"), 9141 E. Sutton Dr., Scottsdale, AZ 85260, or such other place as the Holder hereof may from time to time specify, the principal amount of Eight Hundred Thousand and 00/100 Dollars ($800,000.00) inclusive of interest from the date hereof as specified herein.

All outstanding principal and interest shall be payable in full in one lump sum thirty-six (36) months from the date hereof (the "*Term*").

This Note may be prepaid in whole or in part at any time or times without penalty. All prepayments shall be applied first against accrued late fees, then against accrued interest, then against the installments of principal payable hereunder in the inverse order of maturity.

The Maker represents that this debt arose in a business transaction pursuant to the Membership Interest Purchase Agreement by and between Maker and Holder, dated effective as of October 31, 2019, for the purchase of all of Seller's membership interests in Dan Peterson Property Management, LLC (the "*Purchase Agreement*"). This Note is secured by a Pledge Agreement of even date herewith (the "*Pledge Agreement*") covering all of the Membership Interests in Dan Peterson Property Management, LLC acquired by Maker under the Purchase Agreement. Reference is made to the Pledge Agreement for additional rights of the Holder in the event of default thereunder, and the terms of the Pledge Agreement are incorporated herein by reference.

Maker may set off any amounts Maker and Holder agree are due and owing to it pursuant to the terms of the Purchase Agreement without the need for a court order for same.

The entire balance of principal then remaining unpaid, plus accrued interest and accrued late fees, shall at once become due and payable at the option of the Holder hereof, without notice or demand, upon any of the following event, each of which shall constitute a default:

      (a)     In the event of non-payment within five (5) business days of when due;

      (b)     Upon the insolvency of any of the undersigned;

      (c)     Any petition or application for any form of relief under any provision of the Bankruptcy Code or any other law pertaining to reorganization, insolvency or readjustment of debts is filed by or against Maker, its assets or affairs;

      (d)     Maker makes an assignment for the benefit of creditors, is not paying its debts as they become due, or is granted an order for relief under any chapter of the Bankruptcy Code;

      (e)     A Trustee, as defined by the Bankruptcy Code, takes charge of any property of Maker;

      (f)     There is a sale, exchange or other transfer of any collateral given to secure payment of this Note without the prior written consent of the Holder; or

      (g)     Any breach or default under the Pledge and Security Agreement.

Failure to exercise any right contained in this Note by the Holder shall not constitute a waiver of the right to exercise such right in the event of any subsequent default.  Commencing upon a default hereunder, the entire principal balance outstanding, plus accrued interest and late fees, shall thereafter accrue interest at the rate of eighteen percent (18%) per annum.  If Maker shall default under the terms of this Note, Maker hereby agrees to pay and/or reimburse the Holder hereof for any reasonable costs, expenses and/or fees (including, but not limited to, reasonable attorneys' fees) which the Holder hereof incurs in enforcing the terms of this Note and collecting the underlying indebtedness.

In case one or more of the provisions contained herein shall for any reason be unenforceable, invalid or illegal in any respect, such unenforceability, invalidity or illegality shall not affect any other provisions of this Note, but this Note shall be construed as if such unenforceable, invalid or illegal provisions had not been contained herein or if it is equitable under the circumstances, such unenforceable, invalid or illegal provisions shall be reformed, amended and/or construed so as to be enforceable, valid or legal.  Nothing contained in this Note shall be construed to require Maker to pay interest at an amount or at a rate that is greater than the highest rate permitted by law.  If any interest or other charges paid by Maker results in the computation of interest in excess of the highest rate permissible, then such excess is hereby waived (if such excess has not been paid), or if the excess has been paid, then it shall be treated as a reduction in principal.  This Note shall be construed and given effect in accordance with the laws of the State of Delaware.

Holder and Maker acknowledge and agree that this Note, including, without limitation, the payment of interest and principal and the enforcement of this Note, shall be subject to, and is modified by, the terms of the Purchase Agreement.  In the event of any conflict between the terms of this Note and the Purchase Agreement, the Purchase Agreement shall control.

ONPOINT ACQUISITIONS, LLC

Name:  Chris Jurasek

Title:  President

PETERSON_000128

Exhibit D

**MEMBERSHIP INTEREST TRANSFER POWER**

For value received, the undersigned does hereby sell, assign and transfer to OnPoint Acquisitions, LLC, one hundred percent (100%) membership interest in Dan Peterson Property Management, LLC (the "Company") owned by the undersigned, and does hereby irrevocably constitute and appoint any proper officer of the Company as attorney-in-fact to transfer said membership interest on the books of the Company with full power of substitution in the premises.

Dated effective:  October 31, 2019

_____

Dan Peterson, as Trustee of the
Dan D. Peterson Living Trust
dated April 2, 2009

PETERSON_000129