Randy Nussbaum (SBN 006417)
Nussbaum@SacksTierney.com
Clifford J. Roth (SBN 006442)
Roth@SacksTierney.com
SACKS TIERNEY P.A.
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone:  480.425.2600

Attorneys for Defendant Fyve, Inc.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009, a trust formed under the laws of Arizona,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Fyve, Inc, a Delaware corporation,<br><br>　　　　Defendant. | No.  2:23-CV-1874-JJT<br><br>**DEFENDANT'S CROSS-MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>(Assigned to Hon. John J. Tuchi) |

Pursuant to Rule 65, Fed. R. Civ. P., Defendant Fyve, Inc. ("Fyve")[1] respectfully moves the Court to enter a Temporary Restraining Order and a Preliminary Injunction to restore Fyve's control over the management, operations and finances of Dan Peterson Property Management, LLC ("DPPM"), and to restrain and enjoin Plaintiff Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009, from interfering with Fyve's control over DPPM.  This Motion is supported by Fyve's Response to Plaintiff's Request for Temporary Restraining Order Without an Opportunity to be Heard (Doc. 7, filed 9/8/23), which is incorporated herein by reference.

---

[1]　　Plaintiff incorrectly named Fyve, LLC as the Defendant.  The correct name of the entity, a Delaware corporation, is Fyve, Inc.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

This case arose from dispute between Plaintiff Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009 ("Lender"), and Defendant Fyve for control over DPPM, an HOA management company in Scottsdale, Arizona. Lender, the former owner of DPPM, precipitated the litigation when it surreptitiously used self-help in an attempt to wrest control over DPPM's business operations, office, bank account, employees, and information systems. On 9/7/23, Lender then filed a Complaint (Doc. 1) and a Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 2) seeking a Temporary Restraining Order ("TRO") and preliminary injunction to enjoin Fyve from interfering with Lender's access to DPPM's (1) office, (2) bank accounts, (3) books and records, including QuickBooks Online, and (4) employees, contractors and vendors, and to order Fyve to deliver all keys, passwords, codes and other information necessary to access DPPM's website and software. He also requested relief without notice to Fyve, even though Fyve's lawyer at that time was trying to open a dialogue with Lender to avoid exactly what then occurred. Lender claims he has a right to control DPPM under the terms of (1) a Pledge and Security Agreement, and (2) an Assignment of LLC Interests ("Assignment").

Fyve files this Cross-Motion for Temporary Restraining Order and Preliminary Injunction to restore Fyve's rightful control over DPPM as it existed prior to 9/1/23 when Lender attempted to unilaterally seize control over DPPM, its business and affairs. As explained below, under Delaware law or Arizona law, the Pledge and Security Agreement and the Assignment do not grant Lender the right to control DPPM, and instead he is limited to the economic rights of an assignee and the rights of a secured creditor to sell its collateral in a UCC sale.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   Background**

On 10/31/19, Lender and Fyve's predecessor, OnPoint Acquisitions, LLC ("OnPoint"), entered into a Membership Purchase Agreement whereby OnPoint purchased DPPM from Lender for $1.8 million, including a Promissory Note for $800,000 as seller

2

3642119.v1

1  financing after OnPoint paid approximately one million dollars ($1,000,000) down.  The
2  Membership Purchase Agreement and Promissory Note are attached to the Complaint as
3  Exhibits A and C (Docs. 1-2 and 1-4), respectively.  The Promissory Note was secured by
4  (1) a Pledge and Security Agreement, and (2) Assignment (Complaint Exs. B and D (Docs.
5  1-3 and 1-5), respectively).  Under the Pledge and Security Agreement and Assignment,
6  Lender received an assignment of OnPoint's membership interest in the Company as
7  collateral to secure repayment of the Promissory Note.

After Fyve failed to timely tender the July 31st, 2023 payment, Lender sent a default notice and the parties then negotiated for several weeks regarding a short extension that would allow Fyve to complete its ongoing efforts to sell certain other business holdings, which in turn would allow Lender to be paid in full from the sale proceeds.  (*See, e.g.,* Letter dated 8/7/23, Email dated 8/30/23, Complaint Exs. G and O (Docs. 1-8 and 1-16), respectively).

On 8/31/23, Lender informed Fyve of his intent to seize DPPM as of the close of business that day.  (Complaint Ex. P, Doc. 1-17, p. 3).  Fyve responded that it would oppose that take-over attempt and invited Lender to pursue his remedies in Court where both parties would receive due process:

> Based on your unwillingness to allow an orderly transition, in order to protect the value of our asset (and your collateral), FYVE has no choice but to oppose your purported takeover.  You do not have permission to enter the premises, and any attempt to do so will be treated as a trespass.  You are welcome to pursue your remedies in court, where both parties will be afforded full due process.

(*Id.*, p. 2).  Fyve had earlier articulated that any change in control over DPPM would require a 90-day transition period to deal with database segregation and migration, phone systems, accounts payable processing, payroll and other issues.  (*Id.*, pp. 4-6).

On 9/1/23, Lender exercised self-help in an attempt to take control of DPPM's business, including without limitation by changing the locks on its office, seeking to take control of its bank account at Alerus Bank (resulting in a freezing of that account), purporting to fire certain employees, and informing the other employees that Lender was

3

3642119.v1

now in control of the Company. (*See* Lender's Motion for Injunctive Relief, 5:1-2 and 5:7-14; Email dated 9/4/23, Complaint Ex. N (Doc. 1-15).

Lender's wrongful actions have prevented Fyve from operating DPPM's business and have caused and are continuing to cause irreparable harm to DPPM and Fyve's interests in DPPM. Lender has created an intolerable situation in which no one is in full control of DPPM.

## II. Fyve Is Entitled to a TRO and Preliminary Injunction to Restore Its Control Over the LLC

Lender contends that he is the sole owner entitled to full control of DPPM:

> Fyve has forfeited and lost all beneficial interest in the Company pursuant to Section 3 of the Pledge and Security Agreement. The Trust owns 100% of the Company. Fyve no longer has any ownership interest in the Company, and no right to interfere with the Trust's ownership interest. As owner, the Trust is entitled to control the Company.

Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 2, 4:18-22). That contention is based on a misinterpretation of the operative documents and is contrary to Delaware and Arizona law.

### A. Under Delaware and Arizona Law, Lender Has No Rights to Control the LLC, and Is Only Entitled to the Economic Rights of an Assignee and the Right to Sell Its Collateral in a UCC Sale

The Pledge and Security Agreement is governed by Delaware law. DPPM is an Arizona limited liability company ("LLC") governed by Arizona law. As a practical matter, no significant choice of law issue is presented here because the law in both states is substantially similar. Thus, regardless of whether Delaware or Arizona law applies, Lender has no right to control DPPM, but rather is limited to the economic rights of an assignee and the rights of a secured creditor to sell its collateral in a UCC sale.

#### 1. Lender Has No Control Rights Under Delaware Law

Assuming that the Pledge and Security Agreement was fully executed and

4

3642119.v1

effective,[2] paragraph 16 states that it is governed by Delaware law: "This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction)." (Doc. 1-3, p. 5). Under Delaware law, Lender has no control rights and only has the economic rights of an assignee and the right to sell the collateral as a secured creditor.

### a. **Delaware LLC Act**

The applicable statutes are found in the Delaware Limited Liability Company Act. 6 Del. C. §§ 18-101 *et. seq.* ("Delaware LLC Act"). The Delaware LLC Act is "an enabling statute whose primary function is to fill gaps, if any, in a limited liability company agreement." *Achaian, Inc. v. Leemon Family LLC*, 25 A.3d 800, 802 (Del. Ch. 2011).

Lender claims that as Trustee of his Trust, he "owns 100% of the Membership interest of the Company [DPPM]." (Lender's Motion for Temporary Restraining Order and for Preliminary Injunction (Doc. 2, 2:8-10). The Delaware LLC Act does not define "membership interest." But 6 Del. C. § 18-101(10) states as follows: "'Limited liability company interest' means a member's share of the profits and losses of a limited liability company and a member's right to receive distributions of the limited liability company's assets."

The assignment of a member's limited liability company interest is specifically addressed in 6 Del. C. § 18-702. That statute is entitled "Assignment of limited liability company interest" and provides in part (emphasis added):

> (a) A limited liability company interest is assignable in whole or in part except as provided in a limited liability company agreement. ***The assignee of a member's limited liability company interest shall have no***

---

[2] The copy of the Pledge and Security Agreement attached as Ex. B to the Complaint (Doc. 1-3) was not signed by Lender. The signature line for Lender is blank. (Doc. 1-3, p. 6; PETERSON_000134). Fyve does not have any original or copy of the Pledge and Security Agreement signed by Lender. Unless Lender is able to produce a fully executed version of the Pledge and Security Agreement, Fyve reserves its right to argue that no contract was formed, the document is not effective, and Lender has no rights thereunder.

5

3642119.v1

*right to participate in the management of the business and affairs of a limited liability company* except as provided in a limited liability company agreement or, unless otherwise provided in the limited liability company agreement, upon the vote or consent of all of the members of the limited liability company.

 (b) Unless otherwise provided in a limited liability company agreement:

  (1) *An assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member*;

  (2) *An assignment of a limited liability company interest entitles the assignee to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned.*

The statute is clear and stated in mandatory terms – except as provided in an LLC agreement or upon vote or consent of all members (addressed below), the assignee of a member's limited liability company interest "*shall have no right to participate in the management of the business and affairs*" of the LLC. Consistent with the definition in § 18-101(10) quoted above, the statute elucidates that the assignee of a limited liability company interest is not entitled to become a member or to exercise any rights or powers of a member. Instead, he only receives the economic interests of the assignor, i.e., the right to share in profits, losses and distributions and similar items to the extent assigned.

  The plain meaning of § 18-702(a) and (b)(1) and (2) is confirmed by the case law interpreting the statute. For example, after quoting § 18-702(a) and (b)(2), the Delaware Court of Chancery stated: "Thus, it is clear that the default rule under the Act is that an assignment of an LLC interest, by itself, does not entitle the assignee to become a member of the LLC; rather, *an assignee only receives the assigning member's economic interest in the LLC to the extent assigned*." *Achaian*, 25 A.3d at 804-05 (emphasis added).

The *Achaian* Court went on to observe: "[T]he LLC Act's default rules that draw a distinction between an LLC member's economic rights which are freely transferable and those aspects of membership, such as managerial rights, which are not freely transferable,

6

'recognize[ ] that it is far more tolerable to have to suffer a new passive co-investor one did not choose than to endure a new co-manager without consent.'" *Id,* at 804, n.14 (quoting *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 760 (Del. Ch. 2004). *See also*, *In re The IT Group, Inc., Co.*, 302 B.R. 483, 487 (D. Del. 2003) ("Under 6 Del. C. § 18-702(b)(2), the members of an LLC are permitted to assign their bare economic interests to another entity.  In pertinent part, Section § 18-702(b)(2) provides that an assignee is 'entitled to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction or credit or similar item to which the [debtor] was entitled.'").

The Delaware LLC Act supports the proposition that despite the assignment of economic rights that became effective upon its default under the Promissory Note, no control or managerial rights were assigned.  Fyve is entitled to full control of DPPM.

### b.     DPPM's LLC/Operating Agreements

As noted above, the default rules under § 18-702(a), (b)(1) and (2) apply unless the limited liability company agreement provides otherwise.  Here, DPPM's limited liability company/operating agreements do not provide otherwise.  Fyve is not aware of the existence of any LLC or operating agreement for DPPM before it was purchased by OnPoint on 10/31/19.  The original Articles of Organization for DPPM filed with the Arizona Corporation Commission ("ACC") on 10/15/02 (*Exhibit 1* hereto) do not address the issue of an assignment of a member's limited liability company interest.  Since there was no LLC/operating agreement in existence at the that time Lender received the Pledge Agreement and Assignment on 10/31/19, nothing exists to override the default rules under the Delaware LLC that provide that an assignee receives an assignment of only economic rights and not control rights.

Even if two subsequent agreements are somehow deemed to modify the assignment that occurred on 10/31/19, there is nothing in those agreements that would alter the default. Effective 11/1/19, the day after its purchase of DPPM, OnPoint signed an Amended and Restated Operating Agreement of DPPM (*Exhibit 2*).  The subject of an assignment of a

7

3642119.v1

member's limited liability company interest is not addressed in that agreement. Likewise, a subsequent Limited Liability Company Agreement of DPPM, effective 1/1/22 (*Exhibit 3*), contains no provisions regarding the assignment of a limited liability company interest.

Since DPPM's limited liability company/operating agreements are silent on assignment rights, the Delaware LLC Act fills in the gaps to limit the assignment to Lender to economic rights.

### c.  **The Pledge and Security Agreement and Assignment Create a Security Interest in the Collateral and Do Not Transfer Control Over DPPM**

Lender's claim that the Pledge and Security Agreement and Assignment granted him control rights over DPPM will not withstand scrutiny for at least four reasons. Looking first at the Pledge and Security Agreement (Complaint Ex. B, Doc. 1-3), the stated purpose of the document was to create a security interest in the Ownership Interests, which is defined as the "issued and outstanding membership interests in [DPPM]" that OnPoint, the "Pledgor," purchased from Lender, the "Pledgee." (Recital A). Paragraph 1 of the Pledge and Security Agreement provides as follows:

> 1.  <u>Creation of Security Interest in Ownership Interests</u>.  Pledgor hereby assigns and agrees to deliver to and deposit immediately with Pledgee and hereby pledges, mortgages and grants to Pledgee a security interest in and to the Ownership Interests, to secure performance by Pledgor of Pledgor's obligations under this Agreement and to secure the payment of the Pledgor's obligation to Pledgee under the Note.

Paragraph 1 is devoid of any verbiage that suggests control rights were being assigned; the purpose was to grantee Pledgee a security interest in and to the Ownership Interests to secure performance under that agreement and payment of the Promissory Note. Thus, the Pledge and Security Agreement was drafted for collateral purposes only.

Second, the only rights and remedies granted to Lender are set forth in paragraph 7, which provides in part:

> 7.  <u>Remedies</u>.  Upon the occurrence of any Event of Default hereunder Pledgee shall have all the rights and remedies of a secured party under the Delaware Uniform Commercial Code, as well as all rights and

8

3642119.v1

remedies at law or in equity provided by any other applicable law.  In addition, Pledgee shall have, upon the occurrence of any Event of Default hereunder, and to the extent permitted under the Delaware Uniform Commercial Code, the right to make a public or private sale of the Ownership Interests at which Pledgee may bid, and the right to apply any proceeds of any sale of the Ownership Interests to the satisfaction of the obligations hereby secured in such order, amounts and manner which Pledgee, in its sole discretion, may determine. All rights, remedies or powers conferred upon Pledgee herein or by law shall be cumulative.  Pledgor shall be entitled to any proceeds of any sale in excess of the amount owed to Pledgee at the time of default.

This provision clarifies that upon the occurrence of an event of default, Trustee has: (1) the rights of a secured party under the Delaware UCC – which do not include the right to control the entity in which the security interest is granted; (2) the rights and remedies at law or in equity provided by any other applicable law – but Lender does not and cannot identify any law or equitable principle that would give him the sole right to control DPPM; (3) the right to make a public or private sale of the Ownership Interests; and (4) the right to apply the sale proceeds to the amounts owed.  In sum, paragraph 7 does not authorize Lender to unilaterally act to seize control of DPPM.

Third, Lender relies heavily on a phrase in paragraph 3.  That paragraph simply provides for the delivery of the Assignment by OnPoint to Lender at the time of execution of the Pledge and Security Interest (which may never have been executed by Lender, as noted above).  The phrase in paragraph 3 relied upon in Lender's Motion for Temporary Restraining Order and for Preliminary Injunction (3:8-14, and 8:3-9), states as follows: "provided, however, that Pledgor shall retain all incidents of beneficial ownership of such Ownership Interests including, but not limited to, the right to vote the Ownership Interests and the right to receive distributions for so long as an Event of Default (as defined in Section 6) has not occurred and is not continuing without waiver or cure."

This language is not part of the grant of rights to the Lender in paragraph 7, but rather addresses OnPoint's retained rights in paragraph 3 entitled "Delivery and Holding of Ownership Interests."  There is nothing in paragraph 3 or elsewhere in the Pledge and Security Agreement that affirmatively grants to Lender the right to vote or otherwise

9

3642119.v1

exercise control over DPPM.  Rights that are not actually delineated by one party to another cannot be created through negative implication.

Fourth, turning to the Assignment (Complaint Ex. D, Doc. 1-5), again Lender cannot identify anything that gives him control rights over DPPM.  To the contrary, it confirms that only economic rights were assigned by the triggering by an event of default.  The Assignment provides in part (emphasis added):

> For good and valuable consideration, OnPoint Acquisitions, LLC ("Assignor"), hereby transfers, assigns and sets over unto Dan Peterson, as Trustee of the Dan D. Peterson Living Trust dated April 2, 2009 ("Assignee"), all of its limited liability company interests (the "LLC Interests") in Dan Peterson Property Management, LLC (the "LLC"), which LLC Interests include Assignor's right, title and interest in and to ***the LLC's assets and Assignor's capital account, allocable share of future profits and losses, and distributive share of distributions of Assignor***, subject to the terms of the attached Pledge and Security Agreement and the Note.  ***Assignee's rights to allocable shares of future profits and losses, distributive shares of distributions, and rights to the LLC's assets*** trigger only upon event of default as described in the documents identified in this Paragraph.

The Assignment states that it is "subject to the terms of the attached Pledge and Security Agreement," and the Pledge and Security Agreement is governed by Delaware law.  As explained above, under 6 Del. C § 18-702(b)(1), unless otherwise provided in a limited liability company agreement, "[a]n assignment of a limited liability company interest does not entitle the assignee to become or exercise any rights or powers of a member."  Under this statute, therefore, this assignment by OnPoint of "all of its limited liability company interest" is ineffective to assign to Lender as Assignee any of OnPoint/Fyve's rights or powers, including rights or powers to control DPPM.  Moreover, the Assignment does not use a phrase such as "including but not limited to," and instead uses the word "including" before identifying the specific economic rights that are the subject of the Assignment.

In sum, Lender has no authority to exercise control over DPPM under the Pledge and Security Agreement, the Assignment, the limited liability company/operating agreements or Delaware statutes or case law.

10

3642119.v1

## 2. Lender Has No Control Rights Under Arizona Law

Arizona LLC law is substantially similar to Delaware law on the issue of the assignment or transfer of a membership interest in an Arizona LLC such as DPPM. The applicable statute is A.R.S. § 29-3502(A) and (B), which states (emphasis added):

A. *A transfer, in whole or in part, of a transferable interest*:

    1. Is permissible.

    2. Does not by itself cause a person's dissociation as a member or a dissolution and winding up of the limited liability company's activities and affairs.

    3. Subject to section 29-3504, *does not entitle the transferee to* either of the following:

        (a) *Participate in the management or conduct of the company's activities and affairs*.

        (b) Except as otherwise provided in subsections B and C of this section, *have access to records or other information concerning the company's activities and affairs*.

B. *A transferee has the right to receive, in accordance with the transfer, distributions to which the transferor would otherwise be entitled.* Solely for a purpose that is reasonably related to the transferee's right to receive distributions, a transferee has the rights to information under section 29-3410, subsection B.

"Transferable interest" is defined as "the right, as initially owned by a person in the person's capacity as a member, to receive distributions from a limited liability company, whether or not the person remains a member or continues to own any part of the right, and applies to any fraction of the interest, by whomever owned." A.R.S. § 29-3102(29).

Sections 29-3102(29) and 29-3502(A) and (B) thus make clear that under Arizona law, a transferee or assignee of a transferable interest does not receive any rights to participate in the management of the company's activities and affairs or to have access to company records, but rather is limited to the economic rights to receive distributions to which the transferor would otherwise be entitled. Consequently, the analysis under Arizona law is the substantially the same as under Delaware law as discussed in detail

11

3642119.v1

above. And the conclusion is the same: Lender has no right to control DPPM and Fyve is entitled to injunctive relief restoring it to full control over DPPM.

### B. Fyve Did Not Consent to Lender Exercising Control Without Conditions

Lender argues that "Fyve has repeatedly told Dan that he can take the Company back. (*See* Compl., Exs. O-P.)." But a review of the documents relied upon by Lender reveals that Fyve's willingness to allow Lender to take back DPPM in satisfaction of the debt was conditioned on an orderly 90-day transition as part of a full settlement. (Complaint Exs. O and P, Docs. 1-16, p. 2, 1-17, p. 2). The full settlement of course would require a release in exchange for the transition of DPPM to Lender. That does not constitute a consent by Fyve to Lender's unilateral efforts to seize complete control over DPPM and its business operations.

### C. Dan Peterson's Role as One of Four Managers of DPPM Does Not Give Lender the Right to Control DPPM to Benefit Peterson's Trust

On 4/22/22, DPPM filed with the ACC Articles of Amendment to Articles of Organization that listed Dan Peterson ("Peterson") as one of four managers of DPPM as a manager-managed LLC. (*Ex. 4* hereto). The other three managers (Albert Spell, Jeff Bohm and John Ferron) are representatives of Fyve. Fyve in named as the sole member of DPPM.

Peterson's role as a manager of DPPM does not grant Lender the right to control DPPM. First, Peterson is acting in his individual capacity as a manager of DPPM, whereas Peterson in his capacity as Trustee of his Trust is the Lender who has misused the Trustee's security interest to wrongfully attempt to seize control of DPPM. Second, Peterson as manager owes a fiduciary duty to act in the best interests of DPPM, and acting to benefit his Trust to the detriment of DPPM constitutes a breach of that fiduciary duty. Third, as one of four managers, Peterson lacks the authority to override the majority rule of the other three managers who are representatives of Fyve. (*See* Letter from three majority managers of DPPM to Alerus Bank, dated 9/1/23, *Ex. 5*). Lender's actions to gain control over DPPM are not authorized by the majority managers of DPPM and are ineffective.

12

3642119.v1

### D. Fyve Did Not Cease to Be a Member of DPPM

Lender contends that Fyve forfeited and lost all beneficial interest in DPPM. (Lender's Motion for Temporary Restraining Order and for Preliminary Injunction, 4:18-20) That contention is refuted by 6 Del C. § 18-702(b)(3), which provides:

> A member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of the member's limited liability company interest. Unless otherwise provided in a limited liability company agreement, *the pledge of, or granting of a security interest, lien or other encumbrance in or against, any or all of the limited liability company interest of a member shall not cause the member to cease to be a member or to have the power to exercise any rights or powers of a member*.

It is unequivocal that the Pledge and Security Agreement and Assignment constitute a "pledge of, or granting of a security interest, lien or other encumbrance in or against, any or all of the limited liability company interest of a member" within the meaning of the second sentence of § 18-702(b)(3). Indeed, as discussed above, one document is expressly titled "Pledge and Security Agreement," and its stated purpose in paragraph 1 was the "Creation of Security Interest in Ownership Interests." The words "secure," "secured" or "security" appear no less than 12 times in the Pledge and Security Agreement. Since the limited liability company agreement does not provide otherwise, the Pledge and Security Agreement and Assignment do not cause Fyve to cease to be a member or cease to have the power to exercise any rights or powers as the member of DPPM.

### E. Standards for Injunctive Relief

The analysis of the standards for injunctive relief may be abbreviated since both sides agree that injunctive relief is appropriate and have filed Motions for Temporary Restraining Order and Preliminary Injunction.

> Courts use the same standard for issuing a temporary restraining order as that for issuing a preliminary injunction. *Spears v. Ariz. Bd. of Regents*, 372 F.Supp.3d 893, 926 (D. Ariz. 2019). To obtain preliminary injunctive relief, plaintiffs must show: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7,

3642119.v1

20 (2008)). Employing a sliding scale, the Ninth Circuit has stated that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2013), *cert. denied*, 747 F.3d 1073 (2014) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)).

*TGP Communications LLC v. Sellers*, No. CV-22-01925-PHX-JJT, at *5 (D. Ariz. Nov. 23, 2022).

### 1. Fyve Is Likely to Succeed on the Merits

Fyve is likely to succeed on the merits because, for all the reasons discussed above, the documents and law of Delaware and Arizona are clear that Lender (1) only received a pledge and security interest in OnPoint's limited liability company interest and therefore is limited to the economic rights of an assignee and the rights of a secured creditor to sell its collateral in a UCC sale, and (2) does not have the right or power to control DPPM business operations and affairs.

### 2. Fyve Will Suffer Irreparable Harm Without Injunctive Relief

As a result of Lender's wrongful efforts to seize control through self-help, neither side has full control over DPPM. Since 9/1/23, DPPM and Fyve as the sole member of DPPM are suffering immediate, ongoing, irreparable harm because of the unjustified interference of Lender with DPPM's business operations and its relationships with customers, vendors, bank, employees and others. Lender cannot dispute that this factor is satisfied since he also alleges irreparable harm arising from the current situation. (Lender's Motion for Temporary Restraining Order and for Preliminary Injunction, 8:27-10:3).

### 3. The Balance of Hardships Tips in Favor of Fyve

The balance of hardships tips sharply in favor of Fyve because it is the sole member of DPPM, whose value diminishes each day the stalemate continues. In addition, Fyve could suffer increased liability if Lender is able to successfully argue that it is entitled to a r deficiency from Fyve solely because of the decreased value of its collateral caused by Lender's conduct.

3642119.v1

### 4. Public Interest Favors Injunctive Relief in Favor of Fyve

The public has an interest in seeing that the statutory and contractual rights of litigants are properly enforced by the courts. Fyve's statutory and contractual rights are being violated by the self-help actions employed by Lender. The public interest would be furthered by granting injunctive relief in favor of Fyve.

## III. Conclusion

For all of the above reasons, Fyve should be granted injunctive relief. Submitted herewith is a proposed Temporary Restraining Order in Favor of Defendant, which includes the following relief:

1. Fyve is restored to full control over DPPM and all its business operations and affairs to the same extent that Fyve exercised control over DPPM prior to September 1, 2023, including without limitation, DPPM's office, customers, vendors, employees, software, and bank account.

2. Lender, its employees, servants, representatives and anyone who is in active concert with any of these persons (collectively, the "Enjoined Persons") are enjoined from taking any action to deny or interfere with the control of Fyve over DPPM as set forth in the prior paragraph.

3. The Enjoined Persons are enjoined from taking any action to control DPPM or its business operations and affairs, including giving direction to employees and other representatives of DPPM.

4. The Enjoined Persons are enjoined from accessing DPPM's bank accounts

RESPECTFULLY SUBMITTED this 12th day of September, 2023.

SACKS TIERNEY P.A.

By: */s/ Clifford J. Roth*
     Randy Nussbaum
     Clifford J. Roth
     Attorneys for Defendant Fyve, Inc.

15

3642119.v1

# CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2023, I electronically transmitted the foregoing Defendant's Cross-Motion for Temporary Restraining Order and Preliminary Injunction to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills, Esq.
Sean A. Woods, Esq.
Mills + Woods Law, PLLC
5055 North 12th Street, Suite 100
Phoenix, Arizona 85014
*Attorneys for Plaintiff*

/s/ Debra D. Davenport

3642119.v1